885 So.2d 1044 (2004)
STATE of Louisiana
v.
Jeremiah D. MANNING.
No. 2003-KA-1982.
Supreme Court of Louisiana.
October 19, 2004.
Rehearing Denied November 24, 2004.
*1057 Capital Appeals Project, R. Neal Walker, Marcia Adele Widder, David L. Koen, Counsel for Appellant.
Charles C. Foti, Jr., Attorney General, John Schuyler Marvin, District Attorney, Michael A. Pitman, Assistant District Attorney, Counsel for Respondent.
KNOLL, Justice.
The victim Mary Malone, 62 years of age, a clerk in a pharmacy located in Plain Dealing, Louisiana, was found murdered in a wooded area of Bossier Parish on December 19, 2000. On January 16, 2001, a Bossier Parish grand jury indicted defendant, Jeremiah D. Manning, for the first-degree murder of Malone, a violation of La.Rev.Stat. Ann. § 14:30. Two days after defendant's indictment, the State filed its notice of intent to seek the death penalty. On May 6, 2002, a unanimous jury found defendant guilty as charged. At the penalty phase of the trial, the jury unanimously returned a verdict of death finding the following aggravating circumstances: defendant was engaged in the perpetration of an aggravated kidnapping and the offense was committed in an especially heinous, atrocious or cruel manner. Defendant now appeals his conviction and sentence raising 47 assignments of error variously consolidated into 20 arguments.[1] We affirm defendant's conviction and sentence.

FACTS
On December 18, 2000, at approximately 10:45 p.m., Bossier Parish Sheriff's Deputy Jimmy Chreene was on routine patrol driving west on Louisiana Highway 160 when he observed an eastbound vehicle veer off the road. The temperature hovered in the mid-twenties and ice was forming on the water in the ditches. Chreene saw defendant, Jeremiah Manning, emerge from the car and immediately recognized the car as the one Mary Malone, the victim, owned. The officer ran a computerized check of the car's license plate, confirmed it was the victim's, and that no one had reported it stolen.
*1058 When Chreene inquired about the defendant's possession of the vehicle, he told the officer he had been walking on Lake Road when two acquaintances named R.J. (or J.R), Shawn, and a third man he did not know, drove up in the vehicle and offered him a ride. When the officer saw blood on defendant's clothing and asked about its origin, defendant explained he had a fight with R.J. after the wreck. Chreene seriously doubted defendant's assertions because he had an unobstructed view of the accident and he had only seen one person, defendant, emerge from the vehicle. At that point, Chreene handcuffed defendant for reasons of safety and placed him in the back of the police unit. After Chreene radioed for backup, Deputy Cortez Bridges arrived at the scene. Chreene used Bridges's telephone to call the victim's home to determine whether she had loaned defendant her car. Receiving no answer, Officer Chreene telephoned the victim's best friend, Anna Lou Jiles, and requested that she accompany a Plain Dealing police officer to the victim's residence to check on her.
Officer Richard McDonald of the Plain Dealing Police Office accompanied Ms. Jiles to the victim's home. There, the officer and Ms. Jiles found the door to Malone's house open; almost all the lights were illuminated in the house and food was left cooking on the stove. Jiles said that although the victim had set her table several days early for Christmas dinner, she observed that the dinnerware was disheveled; several pieces of tableware were on the floor and one dinner knife was missing. In addition, the victim's purse was found opened in the middle of the floor; several envelopes in the purse, that usually had amounts of cash, were found empty and atop the contents of the purse. The victim was nowhere to be found. These findings were then reported to Deputy Chreene.
In the meantime, Chreene detected the smell of alcohol on defendant and accordingly called Deputy Brian Keith of the DWI Task Force to the scene. When Deputy Keith arrived, he learned that Chreene had not yet Mirandized defendant. Deputy Keith then opened the back door to the police car and read defendant his Miranda rights. When questioned about whether he had consumed alcohol, defendant told the officer he had consumed one beer. Because Keith observed no other signs suggesting defendant was inebriated, he concluded defendant had not been under the influence of alcohol when operating the vehicle.
At this point, Chreene called Major Tom Myrick at home to tell him of the suspicious circumstances and to ask him to come to the scene of the accident. Myrick arrived at approximately 11:50 p.m. After defendant confirmed that law enforcement authorities advised him of the Miranda warnings and he wished to waive them, defendant told Major Myrick that J.R. and Shawn picked him up in the vehicle in Plain Dealing and that he was traveling in the backseat of the car when it wrecked. Defendant further claimed he did not know who owned the vehicle and contended that after the accident, the other two had gone off in the woods or caught a ride.
Suspecting foul play, Major Myrick requested defendant accompany him to the Plain Dealing police station to continue the interview.[2] Defendant agreed, and after being transported to the police station, he *1059 was again given Miranda warnings. Defendant then gave an evolving series of statements to Major Myrick about how he came into possession of the vehicle, making various changes when confronted with facts which disproved earlier versions of the story.[3] In his final statement, defendant claimed he was present when J.R. and Shawn abducted the victim at her home and he reluctantly accompanied them in the rear seat of her vehicle while the victim was sandwiched between the two men in the front of the car. Defendant exited the vehicle when they had turned off the highway and onto a dirt road. Later, defendant returned down the trail on foot where he found the dying victim and surmised that J.R. and Shawn murdered the victim. He then walked back to the highway and found the victim's car in the ditch. Shortly thereafter, Deputy Chreene pulled up in his police vehicle.
Defendant agreed to take the police to the location where he had allegedly discovered the victim's body. Defendant led Myrick and other detectives to a remote wooded area off of Highway 160. The police found the victim lying face down in a pool of blood; her arms were extended above her head and her blouse was bunched around her neck. When personnel from the Coroner's Office rolled the body over, they found the victim's throat was slashed and her skull was fractured.
Aware of numerous inconsistencies in defendant's story, the detectives wanted to interrogate defendant further about the crime when they returned to the police station. However, defendant indicated he was tired and cold and would prefer to continue the interview later. The officers abided by defendant's wishes and booked him into jail.
On the morning of December 20, 2000, Major Myrick conducted a final, secretly videotaped, interview of defendant. Defendant told the officer essentially the same story that he did before leading the officers to the victim's body. Defendant maintained that although he had been a passenger in the victim's vehicle during the abduction, J.R. and Shawn were responsible for the victim's death. After Major Myrick confronted defendant with the information contradicting certain aspects of his statement, defendant requested an attorney. At that point interrogation ceased.
The record further shows that at approximately 10:00 p.m. on the night of the crime, Monica Liles and her fiancee observed the victim's car while they drove on Highway 157. She testified the victim was driving slowly and another person was in the front seat of the car. Liles thought the victim might be lost because she appeared confused. However, when Liles noticed another person in the passenger seat, she concluded the victim was okay. Although Liles did not get a good look at the passenger, she stated she was certain there were only two occupants in the vehicle. About 45 minutes later, Liles passed the victim's moving vehicle twice more on Highway 157, catching a glimpse of the victim as she continued to drive very slowly.
At approximately 11:00 p.m., Liles saw the victim's vehicle stuck in the ditch. A police car had pulled up and she saw defendant in handcuffs standing next to the car. Liles testified that at the time, she *1060 thought it was same car she had seen earlier, but dismissed the idea because she had seen "two people in that car. There was a little gray headed woman driving that one, so it can't be." (R., vol.XIII, p. 3149).
The police investigation uncovered various items of physical evidence that helped build the case against defendant. Subsequent DNA analysis linked the blood found on defendant's pants to that of the victim. In addition, Detective Danny Lemoine discovered the missing dinner knife under the floor mat of the victim's wrecked vehicle. The Coroner testified he was able to match the serrations of the missing dinner knife with the serrated markings found in the victim's throat, as well as the laceration across the victim's forehead.
Major Myrick testified that detectives conducted an exhaustive search of the Springhill area in an attempt to corroborate defendant's story concerning the other alleged assailants Shawn and J.R. Investigating officers located Shawn Minnifield and Andrew Lee "J.R." Brantley, the only men they could find in the area who even vaguely met the description defendant provided. Both men provided solid alibis and willingly consented to submitting DNA samples. Both men were only vaguely acquainted with defendant and each other. Subsequent DNA analysis excluded Shawn and J.R. as perpetrators involved in the murder of the victim.

LAW AND DISCUSSION
We have categorized defendant's assignments of error into three broad categories according to their pertinence: guilt phase; penalty phase; and those applicable to both phases of trial.

GUILT PHASE

Change of Venue
Defendant claims the trial court erred when it denied his motion for a change of venue. Defendant contends pre-trial publicity in Bossier Parish rendered it impossible for him to obtain a fair trial there.
The record shows the trial court deferred its ruling until after the venire had been questioned about its knowledge of the case. Following jury selection, the trial court denied the motion, ruling as follows:
Based upon the fact that the jury has been selected and the [c]ourt is of the opinion that the jurors that have been selected have not been influenced nor was the majority of the jury venire panel influenced by any pre-trial publicity, the request for [c]hange of [v]enue will be denied.
(R., vol.XIII, p. 3040).[4]
Defendant claims the trial court's assessment of the jurors' familiarity with the *1061 case was mistaken because of its failure to conduct individualized voir dire and that in any event, an analysis of the factors set out in State v. Bell, 315 So.2d 307, 309 (La.1975), demonstrates it erred in denying the motion.
A defendant is guaranteed an impartial jury and a fair trial. LA CONST. ANN. art. I, § 16; State v. Brown, 496 So.2d 261, 263 (La.1986); Bell, 315 So.2d at 309. To accomplish this end, the law provides for a change of venue when a defendant establishes he will be unable to obtain an impartial jury or a fair trial at the place of original venue. Id.; Rideau v. Louisiana, 373 U.S. 723, 726-27, 83 S.Ct. 1417, 10 L.Ed.2d 663(1963).
LA.CODE CRIM. PROC. ANN. art. 622 governs changes of venue. It provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the trial court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial. State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 552-53, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).
In unusual circumstances, prejudice against the defendant may be presumed. See State v. David, 425 So.2d 1241, 1246 (La.1983) ("[U]nfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob."). Otherwise, the defendant bears the burden of showing actual prejudice. State v. Vaccaro, 411 So.2d 415, 423-24 (La.1982); State v. Adams, 394 So.2d 1204, 1207-8 (La.1981); State v. Williams, 385 So.2d 214, 215-17 (La.1980), cert. denied, 449 U.S. 1017, 101 S.Ct. 580, 66 L.Ed.2d 478(1980).
Whether a defendant has made the requisite showing of actual prejudice is "a question addressed to the trial court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." State v. Wilson, 467 So.2d 503, 512 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246(1985); see also Vaccaro, 411 So.2d at 424. Several factors are pertinent in determining whether actual prejudice exists, rendering a change in venue necessary: (1) the nature of pre-trial publicity and the degree to which it has *1062 circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Brown, 496 So.2d at 263; Bell, 315 So.2d at 311.
In the present case, a review of these factors demonstrates the trial court did not abuse its discretion when it denied the motion.

A. The nature of pretrial publicity and the degree to which it has circulated in the community.
In support of his motion, defendant submitted 14 newspaper articles concerning the crime at the initial hearing on the issue.[5] The articles submitted in support of the motion for a change of venue include seven which ran in THE TIMES,[6] four which appeared in the BOSSIER PRESS-TRIBUNE, two from the BOSSIER BANNER-PROGRESS, and the victim's obituary published in the BOSSIER PARISH POST. These articles reveal this offense was likely the first murder in the small community of Plain Dealing[7] in 16 years and produced considerable fear among its residents.[8] Defendant also notes some of the newspaper articles contained references to his involvement in unrelated other offenses  information that would not be admissible at trial as a result of this Court's rules governing the admission of other crimes evidence. For instance, in an article immediately following the crime, THE TIMES reported defendant had "previous brushes with the law" and that he was "awaiting trial on a simple burglary charge stemming from a September 1999 business break-in in downtown Plain Dealing" which "led to a fire that destroyed much of the downtown area." Larry Burton, Plain Dealing killing shocks town, THE TIMES, December 20, 2000, at 1A. Other *1063 articles focused largely on the victim's character, including a description by her employer's wife in which she was depicted as "like a second mother to us." Gregg Trusty, Plain Dealing residents deal with loss of citizen, friend, BOSSIER PRESS-TRIBUNE, December 21, 2000 at 1A.[9]
Voir dire examination reveals that of the 92 prospective jurors examined concerning their familiarity with the case, 58 (approximately 63%) responded they had some exposure to it. Notwithstanding, a defendant is not entitled to a jury entirely ignorant of his case and cannot prevail merely by showing a general level of public awareness about the crime. State v. Thompson, 516 So.2d 349, 352 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). In fact, this percentage is comparable and in some instances considerably smaller than that found in other cases in which this Court has found no abuse of the trial court's discretion in denying a motion for a change of venue based on the number of prospective jurors familiar with the facts of the case. See e.g., State v. Clark, 02-1463 (La.6/27/03), 851 So.2d 1055, 1073 (78 out of 124 (62% of the venire members) "responded they had some exposure" to the case); State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1, 16 (110 out of 113 (97% of the venire members) "had been exposed to some publicity surrounding the case");[10]Hoffman, 768 So.2d at 555 (72 out of 90 "prospective jurors [80%] had awareness of the case before trial"); State v. Connolly, 96-2680, p. 5, (La.7/1/97), 700 So.2d 810 (although 86.33% (120 out of 139) potential jurors possessed some knowledge about the crime, most had only a vague recollection of the surrounding facts); State v. Wilson, 467 So.2d 503, 513 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985) ("a majority of prospective jurors (i.e. 24 of 39)[61.5%], admitted exposure to pretrial publicity.... A review of the responses of the potential jurors on voir dire does not reveal the existence of collective community prejudice which could have denied defendant a fair trial before impartial jurors."); State v. Rodrigue, 409 So.2d 556, 559 (La.1982) (In a mock voir dire set up in order to determine the impact of media coverage, 26 of 30 prospective jurors (86%) had read about the case; the court ultimately determined a jury could be chosen in that parish). Compare State v. Clark, 442 So.2d 1129, 1133 (La.1983) (motion for change of venue granted based on dry run voir dire in which 37 of 38 jurors (97%) recalled details of crime).

B. The connection of government officials with the release of the publicity
Some of the newspaper articles about the crime contained quotes from Bossier Parish Sheriff Larry Deen. In an article revealing defendant and an inmate charged with an unrelated murder had been moved from the Bossier Parish Jail to the Caddo Correctional Center to avoid the possibility of an escape attempt, the Sheriff stated, "People who've committed this type of crime... don't have anything to lose, and will try to do anything they can to become free people. They're constantly working those angles. They'll make any attempt to escape." Gregg Trusty, Alleged murderers moved to Caddo Parish lockup, BOSSIER PRESS-TRIBUNE, February 15, 2001 at 1A. The article also *1064 quoted the Sheriff as claiming they had foiled defendant's plan to escape and defendant "was just a big ol' boy who wanted to be bad, thought he was bad, and just absolutely found out he wasn't bad." Id. In another article, the Sheriff's spokesman, Ed Baswell, stated the authorities thought defendant "is telling us about 90 percent of the truth ... but there are still plenty of holes in his story. He still maintains he was with two other people, and the two other people were the perpetrators." Gregg Trusty, Plain Dealing Murder: Police find alleged murder weapon, BOSSIER BANNER-PROGRESS, December 27, 2000, p. 1. The article continued that the authorities were "very skeptical" of defendant's claim concerning the other assailants. Id. We note these articles appeared well in advance of defendant's trial which began on May 3, 2002.

C. The length of time between the publicity and the trial
Although defendant's trial began on May 3, 2002, approximately a year and a half after the commission of the offense, defendant argues prospective jurors hypothetically could have been exposed to pre-trial publicity because the venire was not sequestered before trial commenced. Even though several articles were published about the upcoming trial before the jury was sworn and sequestered, these were neither attached as exhibits to defendant's motion for a change of venue nor referenced in argument. Accordingly, this Court will not consider them. See Clark, 851 So.2d at 1068, n4. Moreover, we observe the trial court repeatedly admonished the venire to avoid media coverage of the case. In any event, defendant makes no showing that prospective jurors did not abide by the trial court's order to avoid media coverage of the case before sequestration.

D. The severity and notoriety of the offense
As noted above, the present offense was apparently the first murder in Plain Dealing in 16 years and thus received significant media attention. In a newspaper article revealing that the State would seek the death penalty, the district attorney described the crime as a "brutal, cold-blooded murder." Gregg Trusty, D.A. to seek death penalty for parish murder, BOSSIER BANNER-PROGRESS, December 28, 2000, p. 1. Nonetheless, when comparing the case to another notorious trial that occurred in Bossier Parish, the trial court stated "this case has received no where [sic] the publicity that the Highland rapist had." (R., vol.IV, p. 957).[11] Accordingly, the publicity received by the present offense does not appear unprecedented.

E. The area from which the jury is to be drawn
Defendant claims a fair trial in Bossier Parish would have been impossible because newspaper articles labeled him as one of the "Plain Dealing Seven," a group of individuals "authorities believe to be responsible for the 1999 fire that leveled the town's business district." Gregg Trusty, Plain Dealing Murder: Police find alleged murder weapon, BOSSIER BANNER-PROGRESS, December 27, 2000, p. 1. However, even assuming defendant's notoriety in Plain Dealing would have made it impossible for him to obtain a fair trial if the jury had been drawn solely from residents of that community, it does not follow his notoriety extended to the entire parish.[12] As the trial court noted when deferring its ruling on defendant's motion for a change of venue,

*1065 [I]f the northern end of the parish was the most populous portion of this parish, you might have some argument with regard to your  or you might have some merit with regard to your argument. But Plain Dealing is probably one of the smallest populated areas in the parish. It's  the population of Plain Dealing is probably less than ten (10%) percent of the total parish population.
(R., vol.IV, pp. 957-58). See n6 and n11, supra.

F. Other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant
Except for being labeled one of the Plain Dealing Seven as a result of his complicity in the fire that destroyed part of the town's business district, defendant does not point to any unrelated events that reflected the attitude of the community or jurors towards him. However, defendant maintains Bossier Parish is a racially polarized area and that in this black-on-white crime, defendant's race "was demonstrably an issue in this case." Brief for Appellant, p. 10, n25.

G. Other factors likely to affect the candor and veracity of the prospective jurors on voir dire
Finally, defendant claims the rural close-knit nature of the community prevented prospective jurors from responding truthfully when questioned during voir dire. Specifically, defendant claims five venire members knew the victim and/or her relatives and 21 were familiar with either members of law enforcement or employees of the District Attorneys' offices involved in the case. In addition, defendant asserts seven venire members either knew or thought they knew defense counsel. Finally, defendant contends 16 venire members claimed familiarity with the case from sources other than the media, presumably from discussing it with neighbors or friends.
Defendant's claim that these relationships affected the venire members' responses during voir dire are nothing more than speculation. Notably, in State v. Clark, this Court flatly rejected the defendant's claim that smaller, rural parishes are improper venues for capital cases as a result of the local population's familiarity with the offense. Clark, 851 So.2d at 1075.[13]
*1066 While the record reveals some jurors possessed a general knowledge of the case, defendant fails to demonstrate the existence of an overriding prejudice in the community that prevented him from receiving a fair trial. Notably, even in his argument related to purportedly erroneously denied challenges for cause, see infra, defendant does not single out one juror the trial court should have excused as a result of preconceived notions of his guilt resulting from pretrial publicity about the case. Even assuming every defense cause challenge and joint cause challenge was based on the prospective juror's potential bias in the case, the index of voir dire examination shows that of 93 venire persons questioned to select the panel and alternates, 30 were excused for cause, or slightly less than one-third of the total number of jurors examined. That percentage falls in a range that this Court has found insufficient to justify a presumption of communitywide prejudice. See State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810(43%); State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1(30%); see Murphy v. Florida, 421 U.S. 794, 802-03, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) ("The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."). Moreover, as discussed above, this Court has approved several rulings in which the trial court has denied the defendant's motion for a change of venue in which a far greater percentage of jurors expressed a familiarity with the case. See Frank, 803 So.2d at 16; Hoffman, 768 So.2d at 555; Connolly, 700 So.2d at 815. Finally, as discussed above, the trial court was not required to move the case to a different parish solely because the crime occurred in a rural community. Clark, 851 So.2d at 1075.
Considering the various elements enunciated in Bell, defendant fails to show the trial court abused its discretion when it denied the motion for a change of venue. This argument lacks merit.

Motion to Suppress Custodial Statements
Defendant claims the trial court erred when it denied his motion to suppress his inculpatory statements.
As a general matter, before a confession may be admitted into evidence, the State has the burden of affirmatively showing it was made freely and voluntarily, and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises. La.Rev.Stat. Ann. § 15:451; State v. West, 408 So.2d 1302, 1307 (La.1982); State v. Dewey, 408 So.2d 1255, 1258 (La.1982). Furthermore, if the statement was made during custodial interrogation, the State must show the defendant was advised of (and waived) his constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Petterway, 403 So.2d 1157, 1159 (La.1981); State v. Sonnier, 379 So.2d 1336, 1355 (La.1979). Once a suspect in custody expresses a desire, at any stage in the process, to deal with the police only through counsel, all questioning must cease and the accused may not be subject to further interrogation until counsel has been made available to *1067 him, unless he initiates further communication, exchanges or conversation with the police, and validly waives his earlier request for counsel. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Miranda, 384 U.S. at 440-45, 86 S.Ct. 1602.
In the present case, the trial court conducted a hearing on defendant's motion to suppress on May 21, 2001. The first witness to appear was Officer Jimmy Chreene of the Bossier Parish Sheriff's office. Chreene testified he was on patrol on the night of the crime when he observed the victim's vehicle run into a ditch at 10:45 p.m. on Highway 160. The officer approached the scene and recognized defendant from previous encounters. When defendant told the officer he did not have a driver's license, Chreene ran a computer search to determine whether he owned a license and who was the registered owner of the vehicle. Pursuant to the computerized search, the officer learned defendant did not have a driver's license and the vehicle was registered to Mary Malone. He further learned the car had not been reported stolen. Because Chreene had seen defendant working in Malone's yard, the officer did not necessarily suspect he had committed a crime. Chreene asked what had transpired and defendant responded he had been walking north on Highway 3 when three men drove by and picked him up. Defendant identified the men as R.J. (or J.R.), Shawn, and a third individual defendant did not know. Chreene then detected blood on defendant's clothing and asked him about its origin. Defendant responded that he and R.J. had a physical altercation immediately before the wreck and the three other occupants of the vehicle had fled after the car entered the ditch. Chreene knew that defendant was lying as he had personally witnessed the accident, but did not see anyone else emerge from the car. The officer then placed defendant in handcuffs for his own safety. Notably, the officer clarified that when he initially asked defendant about the circumstances of the accident, he was not under arrest at the time. The officer then placed defendant in the back of his police vehicle and radioed for backup.
Officer Cortez Bridges arrived shortly thereafter. Chreene used Bridges's telephone in an attempt to call Malone and inform the victim that her vehicle was missing. Unable to reach the victim, Chreene contacted her best friend, Anna Lou Jiles, and directed her to the police station to meet with another officer who would escort her to Malone's residence to investigate the matter. Officer Bridges then left the scene and Officer Brian Keith of the DWI task force arrived. Chreene had smelled alcohol on defendant and asked Officer Keith to "check him out ..." Keith then had defendant exit Chreene's vehicle, talked to him briefly, put him back in the rear of the police unit, and gave him Miranda warnings. Later, Chreene learned that a Plain Dealing police officer, Rick McDonald, Jr., had escorted Jiles to the victim's home and that she was not present. With defendant still in the back of his vehicle at the location of the accident, Chreene radioed Lieutenant Tony Staton and told him to come to the scene. The lieutenant and other detectives arrived soon afterwards and transported defendant to the Plain Dealing police station to interrogate him.
DWI Task Force Officer Brian Keith testified concerning his encounter with defendant, stating he arrived at the scene at approximately 11:00 p.m. pursuant to Officer Chreene's call. Chreene informed him that he had smelled alcohol on defendant's breath and Keith asked the officer if he had administered Miranda warnings. After learning that Chreene had not Mirandized defendant, Keith opened the rear *1068 door of the police unit and read defendant his Miranda rights. Defendant indicated he understood his rights and in response to the officer's inquiry concerning his consumption of alcohol, told Keith he had drunk "a beer." Keith further stated the alcohol odor was "very light" and defendant did not appear intoxicated. Accordingly, the officer did not conduct a field sobriety test. Other officers, including Lieutenant Staton and Major Tom Myrick arrived at the scene shortly thereafter.
Major Tom Myrick testified he supervised the criminal operations division of the Bossier Parish Sheriff's Department. He stated he received a phone call at his residence from Lieutenant Staton at approximately 11:00 p.m. on December 18, 2000. The officer arrived at the scene at approximately 11:45 p.m. and learned the vehicle was owned by the missing victim and defendant claimed he had been picked up in the car by other African-American males who fled from the vehicle immediately following the accident. Even though Myrick learned that Officer Keith had Mirandized defendant, he nonetheless asked defendant if he had been read his rights. Defendant confirmed to Myrick that Officer Keith had Mirandized him and he understood his rights. Myrick further testified that defendant's speech was not slurred, that he did not appear intoxicated, and that he understood the officer's inquiries. Myrick escorted defendant from the backseat of the police unit to the front of the car so the two men could talk more comfortably. There, defendant repeated a similar story to that which he had related to Chreene; telling Myrick he was in the vehicle with R.J., Shawn and a third African-American male whom he did not know and that he and R.J. "had gotten into a fight after the accident" and that the three men had fled into the woods. (R., vol.IV, p. 998). Defendant also told the officer he had no knowledge concerning the ownership of the vehicle. Aware defendant was likely lying about the other persons purportedly traveling in the vehicle and that Malone's house had been found empty with one of the doors open and food left cooking on the stove, Myrick told defendant they needed to go to the police station because there existed "a few serious unanswered questions" and that there "was a possibility of a very serious offense." (R., vol.IV, p. 998).
Deputy Chreene transported defendant to the police station so that Myrick, now accompanied by Detective Jeff LaCaze, could interview him. Unable to locate a waiver of rights form, Myrick re-administered Miranda warnings from memory and defendant again indicated he understood his rights and wanted to waive them. Defendant then gave an evolving series of statements.
In the first statement, defendant claimed he was walking through town on Louisiana Highway 3 towards his father's home located in the Bolinger community when the vehicle came by. Inside were the driver, whom he knew as R.J. or J.R., and two passengers, one named Shawn and a third in the backseat that defendant did not know. Defendant entered the backseat on the driver's side and the men drove down Highway 157 to the intersection of Highway 160. On the way, J.R. indicated that "they had just gotten the car from an old lady [and] they were taking it to a chop shop in New Orleans." (R., vol.V, p. 1003). They drove around a curve and the car veered into the ditch. Defendant was angry at J.R. for wrecking the car and nearly injuring him during the accident and the two men got into a fight, resulting in the blood on defendant's clothing. Before the deputy reached the scene, the other three men "had run off into the wooded area and apparently caught a ride." Id.
*1069 The second statement was similar except defendant indicated he had gotten into an argument with J.R. and exited the vehicle before the car had wrecked. The officer then told defendant he had observed an "unusually large baby seat sitting in the rear seat of the vehicle ... taking up nearly two-thirds of the rear seat" and it would have been impossible for him to get in the back seat with another person present. (R., vol.V, p. 1004). Defendant then admitted he had lied about the presence of the third unknown black male. Myrick advised defendant he did not believe he had "told all of the truth" and sought to question him further in an attempt to locate the missing victim.
The officer continued that defendant's statement changed continuously, "correct[ing] certain features of the story that didn't make sense." (R., vol.V, p. 1005). In a subsequent statement, defendant claimed J.R., Shawn, and two unidentified men had picked him up in a white van and he, J.R. and Shawn were dropped off near the victim's house, where they planned to steal her car. Defendant remained near the street while J.R. and Shawn approached the house. Defendant overheard the victim telling the men they were welcome to take her keys and money but asking them not to hurt her. He became upset and left the scene, walking back uptown. Minutes later, J.R. drove up in the victim's car. Shawn sat in the passenger seat while the victim sat between the two men in the front. Defendant entered the rear passenger seat and the car proceeded along Highway 157 until the men reached Highway 160 and then turned left. They had driven approximately two miles on 160 when J.R. slowed down and turned onto a dirt road. When the victim became upset and defendant realized that J.R. and Shawn "were about to do ... bodily harm to her," defendant opened the rear door and exited the vehicle. (R., vol.V, p. 1006). J.R. rolled down the driver's side window and told him, "[D]on't you tell anyone what we've done tonight or we'll get you." (R., vol.V, p. 1007). Several minutes later, the vehicle emerged, turned eastbound on Highway 160 and proceeded out of sight. After walking on the highway for approximately half of a mile, defendant came upon the vehicle sitting in the ditch. He checked for occupants and found the car empty before Officer Chreene pulled up and apprehended him.
When reminded about the blood on his clothing, defendant stated that after the vehicle had passed him on the highway, he walked back up the dirt road in an attempt to locate the victim. Defendant claimed he wanted to check on the victim's welfare and ensure she would tell police that he had not been involved in her beating or abduction. As he stumbled down the dirt trail in the poorly lit area, someone grabbed his leg. Defendant knelt down and realized it was the victim. He cradled her in his arms, telling her how sorry he was, and asked if he could help her. However, the victim could not respond, making only gurgling noises. Defendant then walked back up the dirt road returning to the highway where he saw the wrecked vehicle. After he reached the car, Deputy Chreene arrived at the scene.
Major Myrick ascertained he would get no closer to the truth at that point and asked defendant if he thought the victim was dead. Defendant responded affirmatively and indicated he could take the officer to the location of her body. Defendant then accompanied Myrick in his police car and directed him to the dirt road off of Highway 160 where the victim's body was found.
Major Myrick stated at no time between when he first met with defendant at approximately 11:45 p.m. until the discovery of the victim's body at about 3:15 a.m. did defendant indicate he wished to cease answering *1070 questions or consult with an attorney. The officer further maintained defendant was cooperative throughout the interrogation and did not appear in any way intoxicated. Finally, defendant had no problem understanding the various officers and responded intelligently to their inquiries.
Major Myrick testified that following the discovery of the victim's body, Detectives LaCaze and Scholz returned defendant to the police station and brought him to an interrogation room. They began to re-administer Miranda warnings, but defendant advised them he was cold and tired and wanted to go to bed. The officers complied with defendant's request and booked him with first-degree murder, aggravated kidnapping, and aggravated burglary before transporting him to the parish jail.
Myrick interrogated defendant a final time on the morning of December 20, 2000, at approximately 9:00 a.m. The officer informed defendant that police had developed more information about the crime and would like to interview him again. Defendant agreed and after again receiving Miranda warnings, executed a waiver of rights form, which the State introduced into evidence. Defendant then gave a 2-hour videotaped statement, a transcript of which the State introduced into evidence for purposes of the motion to suppress hearing.
In the videotaped statement, defendant claimed he was at a store, "Carrington's," on Highway 2 when he encountered J.R., whom he had seen a "gang of times" in both Plain Dealing and Springhill. Exh. 2, pp. 3-5. J.R. was driving a white van with three African-American men, including Shawn, riding as passengers. J.R., whom defendant had seen at a nightclub in Springhill the previous Saturday, told him that they were going to steal cars and bring them to a chop shop in New Orleans. Defendant informed the men he "need[ed] to go gamble downtown" and told them to "holler at [him] when [they] got down there." Id., pp. 8-9. After stopping at the Dollar Store to purchase a jacket, defendant went to Kenny's bar, where he shot dice. Defendant consumed a single beer at the establishment and won approximately 60 dollars rolling dice, doubling the money he had with him when he entered the saloon. Defendant left "Kenny's" and went to "Jerry's" where he encountered his sister and her girlfriend. One of the men he had gambled with earlier arrived at the scene and defendant agreed to buy him a beer so the two returned to Kenny's bar. Defendant exited the bar shortly thereafter and walked towards the nearby "gambling shack."
On the way, defendant encountered the white van again with the same four occupants. He entered the vehicle and the men proceeded to the victim's house where defendant, J.R., and Shawn exited and the two remaining men drove off in the van. Defendant ran up to the carport and watched as J.R. and Shawn approached the house, encountered the victim, and demanded her car keys. Defendant maintained he was not familiar with the house and had never seen the victim beforehand. The victim told J.R. and Shawn to "take anything you want" while defendant urged Shawn to leave the scene. Id., pp. 34-35. Defendant grabbed Shawn who was standing over the victim who had either been pushed or had fallen to the floor near her kitchen. Frustrated that his attempts to prevent harm to the victim had proven futile, defendant exited the house alone. Defendant was walking towards Highway 2 when J.R. and Shawn pulled up with the victim sandwiched between the two men in the front of her vehicle. Defendant then entered the vehicle. As J.R. drove, the victim asked the men to let her go, but they proceeded to the dirt road off of *1071 Highway 160. As the car eased down the dirt road, the victim began to struggle and Shawn struck her twice. Alarmed, defendant jumped out of the vehicle and J.R. rolled down the window and said, "Bitch, you tell anybody I swear I kill you. I'll kill somebody in your family...." Id., pp. 49-50. Defendant ran back to the highway and tried in vain to flag down a passing vehicle.
Defendant had walked about 25 feet down the highway when J.R. and Shawn emerged from the dirt road in the victim's car and drove off. Defendant then returned down the trail on foot to see if the men had left the victim there. Defendant actually tripped over the victim in the poorly lit area and she grabbed at his feet. The victim was gagging and unable to talk and defendant held her in his arms until she stopped moving. He then laid the victim back on the ground and returned to the highway. After a truck had passed him, he noticed the victim's vehicle in the ditch with its emergency lights flashing. Two cars stopped at the scene and defendant told their occupants that he was okay, but asked that they call the police. A truck then stopped at the scene of the accident and Officer Chreene drove up in his police unit shortly thereafter.
Defendant described J.R. as about six feet tall with a medium build and a "mini fro." He normally wore Dickies brand clothing and was associated with the Crips gang. Defendant described Shawn as approximately six feet two inches tall with a slightly smaller build than defendant. He thought both men were in their mid-twenties and had met them at a nightclub located in the back of a store in Springhill.
Defendant further claimed he was under the impression J.R. and Shawn would release the victim until the men turned onto the dirt road. He also maintained he never sat in the front of the vehicle and that accordingly his fingerprints would not be found there.
Major Myrick then stated while he believed defendant had told "95%" of the story, several portions of his statement appeared implausible. Specifically, the officer informed defendant that: (1) Deputy Chreene had personally observed the wreck as it occurred and did not see any other individuals exit the vehicle; (2) there existed no footprints on the dirt trail from the highway leading to victim's body; (3) if the perpetrators' intent was to steal a car to sell for its parts, they would not go to an unknown residence to procure a five  or six-year-old four-door Oldsmobile but would rather "jack folks at red lights in nice cars;" and (4) blood patterns on defendant's clothing appeared to be spatter or spray, which did not coincide with his story of holding the victim in his arms as she died. When defendant maintained he had told the truth and requested an attorney, the interview concluded.
The officer then testified that as evidenced by his demeanor in the videotape, defendant appeared to understand his rights before he waived them and was not intoxicated at the time.[14] The officer also maintained defendant had not requested an attorney at any point before the conclusion of the interview.
On cross-examination, the officer stated defendant was not aware that the final interview had been videotaped.
Detective Jeff LaCaze testified he was present during defendant's first (unrecorded) interview at the Plain Dealing police station and observed Officer Myrick provide Miranda warnings. LaCaze continued *1072 that defendant was cooperative, appeared to understand his rights, and did not appear intoxicated when he waived his rights and gave his evolving series of statements about the offense in response to the officers' inquiries. Following the discovery of the victim's body, LaCaze and Deputy Scholz attempted to interview defendant again at the police station at approximately 4:00 a.m. The officers gave defendant a cigarette and began to read him Miranda rights when defendant stated he was tired and wanted to go to bed. The officers immediately ceased their interrogation and booked defendant into jail.
In a lengthy oral ruling, the trial court denied the motion to suppress, stating, in pertinent part, as follows:
[T]he first complaint was that he was arrested based on less than sufficient information to establish probable cause and that the police had no other facts or information to support probable cause than the statements obtained from defendant. That's not supported by the evidence presented. The evidence indicates that the officers had information concerning the disappearance of Ms. Malone. They had sent someone to her house and that the house  she was not there, the door was open; that the stove was cooking  or that food was cooking on the stove. And that the defendant was in possession of her automobile. And the story that he gave was inconsistent with those facts. Certainly that's more than his statement to support their suspicion. And I believe they had sufficient probable cause to make the arrest without warrant. Officer Chreene's investigation, he began investigating what he saw to be a reckless operation or failure to maintain control of a vehicle. During that, he noticed what appeared to be blood; questioned the defendant about that blood. The fact that he saw blood on him doesn't mean the defendant had in fact committed a crime. There was nothing to show that Officer Chreene was aware of any crime having been committed. He knew this defendant had worked for the lady, who he thought the car belonged to, and it's possible that she could have loaned him the vehicle. It was only upon his determination that Mr. Manning's story was inconsistent with  was not that Ms. Malone had loaned him the automobile, but the story that he gave the officer that he became suspicious. He noticed the blood on him. At that time he placed him in handcuffs, placed him in the back of the car and said that the questioning of Mr. Manning ceased.... And based upon that information probable cause was made to determine that he could be arrested without warrant. [T]he next allegation is that he was transported... to the Bossier Sheriff's Office where he was questioned about the homicide in violation of his Sixth Amendment right to an attorney and the rule established in Edwards v. Arizona. That is not supported by the record. He was advised of his rights.... [T]here is no evidence  absolutely none that the defendant did not understand his Miranda rights. That he ever requested an attorney or requested anything that was not given to him by the officers. The evidence is contrary to that. The evidence shows that the officers read him his rights on more than one (1) occasion. That when he told them that he was tired and hungry and cold and didn't want to talk with them any more, they immediately ceased questioning him. And it was some thirty (30) hours later when that interrogation continued. The defendant, in their [sic] motion, admit that he was given his Miranda warnings, but they say that for some reason, the defendant's statement should be suppressed because he was questioned further without counsel. And the only *1073 problem with that is that the defendant never requested counsel. There is absolutely no evidence supporting any request for counsel made by the defendant and the Motion to Suppress is clearly without merit.
(R., vol.V, pp. 1058-61).
Defendant first contends the trial court erred when it admitted defendant's initial statement to Officer Chreene at the scene of the accident in which he claimed he had been picked up in the victim's vehicle by J.R., Shawn, and a third unknown man because the officer failed to provide Miranda warnings before asking about the circumstances of the mishap and how he had come into possession of the car.
The obligation to provide Miranda warnings attaches only when a person is questioned by law enforcement after he has been taken "into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 86 S.Ct. 1602; State v. Payne, XXXX-XXXX (La.12/4/02), 833 So.2d 927, 934. Custody is decided by two distinct inquiries: an objective assessment of the circumstances surrounding the interrogation to determine whether there is a formal arrest or restraint on freedom of the degree associated with formal arrest; and, second, an evaluation of how a reasonable person in the position of the interviewee would gauge the breadth of his freedom of action. Stansbury v. California, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), (citing California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275(1983)(per curiam), Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714(1977)(per curiam)). See Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383(1995).
As such, Miranda warnings are not required when officers conduct preliminary, non-custodial, on-the-scene questioning to determine whether a crime has been committed, unless the accused is subjected to arrest or a significant restraint short of formal arrest. State v. Davis, 448 So.2d 645, 651-652 (La.1984); State v. Mitchell, 437 So.2d 264, 266 (La.1983); State v. Thompson, 399 So.2d 1161, 1165-1167 (La.1981), dissent at 400 So.2d 1080; State v. Menne, 380 So.2d 14, 17 (La.1980), cert. denied sub nom Louisiana v. Menne, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39(1980); State v. Hodges, 349 So.2d 250, 255-257 (La.1977), cert. denied, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978); State v. Brown, 340 So.2d 1306, 1308 (La.1976); State v. Watkins, 526 So.2d 357, 359-360 (La.App. 4 Cir.1988). Thus an individual's responses to on-the-scene and non-custodial questioning, particularly when carried out in public, are admissible without Miranda warnings. See State v. Davis, supra (Question, "Who shot the deer?" directed to a group of hunters did not point the finger of suspicion at any one person, even though wildlife agent knew that adult female deer had been taken and that citizens were holding the culprits, and therefore did not require Miranda warnings); State v. Thompson, supra (question of "how he came by the blood spots on his shirt," asked by officer of man in motel lobby identified as perpetrator of assault and who agreed to talk with the officer, was to learn if crime had occurred and therefore occurred in a pre-custodial setting which did not require Miranda warnings); State v. Mitchell, supra (question asked by an Arkansas deputy after handcuffing a drunken Monroe driver for traffic offenses and noticing dried blood on his neck, "What happened?" did not amount to custodial interrogation for Miranda purposes; defendant's reply, "My wife shot me," admissible without Miranda under time pressure of finding injured wife).
*1074 Similarly, although a motorist stopped for a traffic violation or an individual detained in a Terry stop based on reasonable suspicion has had his freedom of movement curtailed in a significant way,[15] until an arrest actually occurs, these Fourth Amendment seizures do not constitute custody for Miranda purposes. Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda.").
In this case, Officer Chreene testified he did not suspect defendant had committed a crime when he arrived at the scene. While the officer stated he thought the victim owned the vehicle, he also maintained he had observed defendant working in her yard and accordingly that she may have loaned him her car. In this situation, defendant fails to show the trial court erred when it determined the relevant evidence demonstrated defendant was not in custody at the time he made his initial statement concerning the circumstances of the accident and thus found it admissible without Miranda warnings. This claim lacks merit.
Defendant further contends the trial court erred when it admitted his custodial statements because he did not execute a knowing and intelligent waiver of his Miranda rights. Specifically, he claims his alcohol consumption on the night of the offense coupled with his low IQ, rendered his waiver involuntary. In support, defendant points to his request, "When I'm gonna be able to get a lawyer and talk to him?" at the conclusion of his videotaped interview to suggest he did not know that he could invoke his right to an attorney before answering the officers' questions about the crime.
Intoxication may render a confession involuntary if it negates a defendant's comprehension and renders him unconscious of the consequences of what he is saying; whether intoxication exists and to a degree sufficient to vitiate voluntariness are questions of fact. State v. Bourque, 622 So.2d 198, 222 (La.1993); State v. Narcisse, 426 So.2d 118, 126 (La.1983); Vaccaro, 411 So.2d at 425; State v. Robinson, 384 So.2d 332, 335 (La.1980). However, the mere fact of drug or alcohol intoxication is insufficient standing alone to render a confession involuntary. See State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1023-1024, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994)(confession voluntary although defendant had smoked three or four cocaine rocks the night before his 11 p.m. statement, as well as consumed several beers the day he confessed).
In addition, low intellect, moderate mental retardation or diminished mental capacity does not per se and invariably vitiate capacity to make a free and voluntary statement or a knowing and intelligent Miranda waiver. State v. Brooks, 93-3331 (La.1/17/95), 648 So.2d 366, 373-375; State v. Benoit, 440 So.2d 129, 131 (La.1983); State v. Lindsey, 404 *1075 So.2d 466, 472 (La.1981), cert. denied, 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983). Voluntariness is determined on a case by case basis, under a totality of the circumstances standard. Brooks, 648 So.2d at 372; Benoit, 440 So.2d at 131.
In the present case, defendant fails to show he did not make a knowing and intelligent waiver. Regarding the alleged intoxication, Officer Keith testified defendant claimed he had consumed only a single beer before the accident. Keith further stated defendant did not appear to be under the influence of any intoxicating substance when he arrived at the scene and accordingly he did not conduct a field sobriety test. That being the case, the trial court did not err when it determined the consumption of alcohol did not undermine the knowing and intelligent waiver of defendant's rights.
With regard to defendant's claim concerning his diminished mental capacity, all of the interrogating officers testified defendant appeared to understand his rights and responded appropriately to their questions. Notably, while the IQ tests administered to defendant showed he possessed below average intelligence, the results did not suggest he was profoundly retarded and thus incapable of understanding his rights. Cf., State v. Anderson, 379 So.2d 735, 736 (La.1980) (fact that the defendant was an illiterate, unemployed 17-year-old with the mental age of 8 and an IQ of between 50 and 69, coupled with ambivalent police testimony about whether he ever understood the rights they attempted to explain to him, supported a conclusion he was incapable of understanding his rights or the ramifications of foregoing them; hence, there was no knowing, intelligent waiver). As Major Myrick noted, defendant's statement about the crime continually evolved as he learned the officers possessed evidence which contradicted various aspects of his exculpatory version of the victim's murder. Moreover, defendant's request for an attorney after his final videotaped statement did not demonstrate he did not understand he could request a lawyer earlier. Rather, it is indicative that upon learning the investigating officers did not believe his story, defendant realized it would be prudent to pursue a different strategy to mitigate his culpability. Defendant fails to show the trial court erred when it concluded he made a knowing and intelligent waiver of his Miranda rights. See State v. Green, 94-0886 (La.5/22/95), 655 So.2d 272, 278-84 (mildly retarded defendant's waiver of rights was knowing and intelligent, even though psychologist testified defendant was unable to comprehend his rights; psychologist also testified defendant was educable and could be made to understand rights, police officers testified defendant understood as well as defendant's criminal history indicated he understood Miranda warnings).
Finally, defendant claims the trial court should have suppressed his videotaped statement because he was not arraigned and appointed counsel promptly in compliance with LA.CODE CRIM. PROC. ANN. art. 230.1(A).
Generally, LA.CODE CRIM. PROC. ANN. art. 230.1(A) requires the period between arrest and arraignment not exceed 72 hours. In this case, the delay did not exceed the statutory maximum and thus no violation occurred. Notwithstanding, even assuming the delay exceeded the time limitations provided, it would have no bearing on defendant's motion to suppress. The remedy for violation of LA.CODE CRIM. PROC. ANN. art. 230.1 is pre-trial release, see LA.CODE CRIM. PROC. ANN. art. 230.1(C), and has "no effect whatsoever upon the validity of the proceedings thereafter...." LA.CODE CRIM. PROC. ANN. art. 230.1(D); State v. Tauzier, 397 So.2d 494, 505 (La.1981); cf. LA.CODE CRIM. PROC. ANN. art. 701(B)(2) *1076 (remedy for violation of speedy trial statute is pre-trial release, not reversal of conviction); State v. Johnson, 622 So.2d 845, 848 (La.App. 4 Cir.1993) (same). This claim lacks merit.
Defendant shows no basis for the suppression of his statements or any derivative evidence. This argument lacks merit.

The trial court failed to redact portions of defendant's videotaped statement which exposed the jury to inadmissible other crimes evidence.
Defendant claims the trial court erred when it failed to order the State to redact certain portions of his videotaped statement.
Initially, defendant claims the trial court should not have allowed the jury to be exposed to that portion of the videotaped statement in which Major Myrick asked him about J.R.'s gang affiliation and defendant responded that J.R. was a "Crip." As a result, defendant claims jurors could have inferred he was a member of a gang and the evidence thus constituted prohibited other crimes evidence. However, even assuming defendant's statement that his alleged accomplice belonged to a gang somehow suggested his involvement in other crimes,[16] he did not object to its admission and thus waived any claim based on it. LA.CODE CRIM. PROC. ANN. art. 841.[17]
Defendant also contends the trial court should have prohibited the jury from viewing the portion of the videotape in which Major Myrick indicated he did not believe certain aspects of his statement. In defendant's view, the officer's comments about the veracity of his statement constituted impermissible opinion evidence that would not have been permitted at trial and thus should have been excised from the videotape. See State v. Brunet, 521 So.2d 594, 596-97 (La.App. 1 Cir.1988) (trial court's refusal to delete prosecutor's comments concerning defendant's credibility from statement of defendant in which defendant claimed that victim's shooting was an accident was reversible error).
From the outset, we again note defendant did not object to the admission of that portion of the videotaped statement and thus waived any claim based on it. LA.CODE CRIM. PROC. ANN. art. 841. Nevertheless, we find Brunet distinguishable. In Brunet the court of appeal reversed the defendant's conviction because the prosecutor who commented on the defendant's credibility in the tape-recorded statement did not testify at trial and thus defendant could not confront the witness. To the contrary, in the present case, because Officer Myrick testified for the State, defendant was afforded the opportunity to cross-examine him concerning his statements during defendant's interview that he did not find portions of his story credible. Accordingly, defendant was not denied the right to confront the witness. This argument lacks merit.

The trial court erred when it denied defendant's motions for a continuance.
Defendant claims the trial court committed reversible error when it denied his motions for a continuance.
*1077 The record reveals the defense filed an initial motion on April 3, 2002, and a supplemental motion on April 8, 2002, seeking a continuance because it had only recently been provided with a copy of Mark Rogers's report concerning the blood spatter evidence and had not received all the autopsy photographs. Following a hearing held on the latter date, the trial court denied the motion, stating:
.... [T]hese photographs were available a year ago. When I made that order of May 21, 2001, they were available. So you can't say you were prejudiced. The blood spatter evidence that the expert is going to testify to, assuming that the [c]ourt allows him to testify as an expert  I'm not  you know, you're assuming something that may or may not even come to fruition. Assuming I allow him to testify as an expert in the field of accident reconstruction and blood spatter analysis, you have sufficient time to hire an expert of your own choosing to contradict whatever evidence he may give, again assuming the court were to allow that. So I don't believe you can show any prejudice.... Absent that showing, you're not entitled to a continuance.
(R., vol.V, p. 1144).
We have consistently held that the decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. Bourque, 622 So.2d at 225; see LA.CODE CRIM. PROC. ANN. art. 712. In addition, this Court generally declines to reverse convictions even on a showing of an improper denial of a motion for a continuance absent a showing of specific prejudice. Bourque, 622 So.2d at 225; State v. Champion, 412 So.2d 1048, 1051 (La.1982).
As an initial matter, we observe the defense filed a motion "to preserve evidence for independent testing" on May 23, 2001, seeking access to defendant's clothing "because it may contain blood spatter [sic] from the victim in this homicide and defendant is entitled to prepare a defense which may involve further forensic testing or analysis." (R., vol.II, pp. 338-39). Accordingly, the defense had nearly a year to counter Rogers's testimony about the blood spatter. Defendant makes no showing the three or four weeks remaining before trial did not provide him with ample opportunity to obtain his own expert. As the State argued when opposing the motion:
What we're talking about ... is viewing photographs and determining if the blood pattern on the defendant's clothing was an active stain, in other words, had some sort of velocity to it or if it was a passive stain, such as transferred by simply brushing up against the body or something of that nature. This can be determined by an expert in a matter of minutes by looking at those photographs. There's no scientific testing, no experiment, no nothing of that nature that needs to take place.
(R., vol.V, p. 1139).
Moreover, the autopsy report had been provided to defendant during discovery and the trial court admitted only those photographs during the guilt phase it deemed necessary for the jury to understand the victim's cause and manner of death. In these circumstances, defendant fails to show he suffered prejudice resulting from the trial court's ruling denying his motions for a continuance. Accordingly, this argument lacks merit.

Jury selection: Challenges for cause
Defendant claims the trial court erred when it denied his challenges for cause to three jurors based on their inability to adjudicate his guilt based on the evidence *1078 presented at trial and/or their predisposition to impose the death penalty.
Prejudice is presumed when a trial court erroneously denies a challenge for cause and the defendant has exhausted his peremptory challenges. An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683, 686; Bourque, 622 So.2d at 225.[18] A trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Cross, 658 So.2d at 686-87; State v. Robertson, 92-2660 (La.1/24/94), 630 So.2d 1278, 1281. A trial judge's refusal to excuse a prospective juror for cause is not an abuse of discretion notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence." Id.; Cross, 658 So.2d at 686-687. In this case, defendant exhausted his peremptory challenges and thus the only issue before us is whether the trial court erred when it denied his challenges for cause.
A. Michael Hinderberger. Defendant claims the trial court should have excused Michael Hinderberger for cause based on his employment in law enforcement and his relationship with Mr. Pittman, one of the State's attorneys prosecuting him.[19]
LA.CODE CRIM. PROC. ANN. art. 797 provides, in pertinent part, that the defendant may challenge a juror for cause on the grounds that:
(2) The juror is not impartial, whatever the cause of his impartiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict.
Even where a prospective juror's affiliations raise an issue regarding his ability to be impartial, if, after voir dire examination, the trial court is satisfied the prospective juror can render an impartial verdict according to the law and evidence, it is the trial court's duty to deny defendant's challenge for cause. State v. Timon, 28,747 (La.App. 2 Cir. 10/30/96), 683 So.2d 315, writ denied, 96-2880 (La.4/25/97), 692 So.2d 1081. A juror's association with law enforcement agencies or personnel will not alone disqualify him from service. State v. Loyd, 35,637 (La.App. 2 Cir. 2/27/02), 810 So.2d 1214, 1223, writ denied, 02-1159 (La.4/21/03), 841 So.2d 779. The fact that a prospective juror is "friends" with, or related to, law enforcement officials or the district attorney is not grounds for automatic exclusion for cause. Connolly, 700 So.2d at 818. A *1079 cause challenge should be granted when the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render a fair judgment may be reasonably inferred. State v. Jones, 474 So.2d 919, 926 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986).
Looking more particularly at the suitability of an actively employed law enforcement officer as a criminal juror, this Court's jurisprudence shows an interesting history. In State v. Simmons, 390 So.2d, 1317, 1318 (La.1980), this Court broadly held that "an actively employed criminal deputy sheriff is not a competent criminal juror." The Simmons court further noted that "... [t]he guarantee of an impartial trial in Article 1, Section 16 of the Louisiana Constitution of 1974 is offended by the presence on a jury of a badge-wearing law enforcement officer." Simmons, 390 So.2d at 1318. Following Simmons, however, courts of appeal limited its holding and carved out exceptions for law enforcement personnel not actively engaged in the field in making arrests and enforcing the law. See e.g. State v. Valentine, 464 So.2d 1091, 1095 (La.App. 1 Cir.), writ denied, 468 So.2d 572 (La.1985)(correctional officer for DOC in St. Gabriel Prison for Women not incompetent to serve although she also had four first cousins who worked for the sheriff in East Baton Rouge Parish); State v. Henderson, 566 So.2d 1098, 1103-1104 (La.App. 2 Cir.1990) (field sergeant at Wade Correctional Institute was competent to serve). Ultimately, in State v. Ballard, 98-2198 (La.10/19/99), 747 So.2d 1077, we unanimously overruled Simmons, holding that if a law enforcement officer indicates during voir dire that he can be an impartial juror, the trial court has the discretion to determine whether or not a cause challenge is warranted.
In the present case, Hinderberger testified on direct examination during voir dire that he could decide the case based on the evidence presented at trial. However, he then stated he knew several of the witnesses based on his employment as an officer with the Shreveport Police Department. Hinderberger initially indicated that because of his employment, he might find the testimony of a police officer more credible than that of a lay witness, but later stated he knew "from personal experience" that law enforcement personnel could be mistaken and accordingly, he "wouldn't be inclined to believe them any more" than any other witness. (R., vol.VIII, p.1900). He also advised the trial court that he could set aside any relationship with these individuals and base his decision on defendant's guilt or innocence on the evidence presented. Finally, he stated he had not spoken to any of the witnesses about the facts of the case and that he could remain impartial.
On cross-examination, Hinderberger stated he had worked with the prosecuting attorney on a vehicular homicide case in Caddo Parish three or four years earlier. He admitted he was not currently working with the prosecuting attorney and had no present contact with him. He also answered affirmatively when asked whether it was possible other jurors would emphasize his discussion in the jury room and that he "would be able to assert undue influence on the other jurors in this case" as a result of his employment as a police officer. (R., vol.XIII, p.1940).
Defendant challenged Hinderberger for cause based on his employment as a police officer investigating violent crimes and his relationship with the prosecutor. The trial court denied the challenge, stating:
[T]he fact that he is a police officer is not grounds for challenge for cause. The only challenge for cause would be to show that he could not be fair and impartial ... because of his relationship *1080 with Mr. Pitman  I specifically asked him a follow-up question and he said he had no personal relationship with Mr. Pitman, that they had worked on one case at one time together and that [he] could be fair and impartial. And I believe that to be true, and that challenge for cause was [sic] denied.
(R., vol.IX, p.2072).
Considering the well established jurisprudence on this issue, it is now clear that the fitness of a prospective juror, including an actively employed law enforcement officer, should rightly be determined on a case-by-case basis after consideration of the grounds to support a challenge for cause set forth in LA.CODE CRIM. PROC. ANN. art. 797. Ballard, 747 So.2d at 1080. Here, there is no indication that Hindenberger as a police officer employed by the Shreveport Police Department had a sufficiently close relationship either with the District Attorney's office in Bossier Parish or with law enforcement agents in that parish to suggest that the officer might not be fair and impartial. While Officer Hindenberger had worked four or five years earlier on a case with the Assistant District Attorney and stated he knew three of the State's witnesses through his employment with a law enforcement agency in a neighboring parish, he also candidly admitted to the trial court he could be fair and impartial in the present case. After reviewing the record of Hindenberger's voir dire examination, we find no abuse of discretion has been shown in the trial court's analysis and appraisal of the prospective juror's testimony and in denying defendant's challenge for cause.[20] This argument lacks merit.
B. Jason Roshto. Next, defendant claims the trial court should have granted his cause challenge to prospective juror Jason Roshto because at the time of defendant's trial he was on probation for domestic battery and had a pending charge for DWI in Bossier City. Defendant argues that given the tenuous status of Roshto's own freedom from incarceration as a result of the pending charge and his probationary status, Roshto was likely to align himself with the prosecution's case to ingratiate himself with the State.
During voir dire examination, the juror admitted he had previously pled guilty to DWI, was currently on probation for simple domestic battery, and had a second DWI charge pending against him. The juror also stated his grandfather had served "some years" in prison for cultivating marijuana.
When asked on cross-examination whether he would "bargain" with the pending charge, Roshto and defense counsel engaged in the following colloquy:
Q: But you're ... hoping for a plea bargain on your DWI case when you ... go to court?
A: I'm not  not exactly a bargain, just to get the  whatever sentence might be lessened a little bit.
Q: Some leniency?
A: Yes. That's the reason I'm paying a lawyer.
(R., vol.XII, p. 2904).
Counsel for defendant challenged Roshto for cause, arguing:

*1081 He has a pending DWI and he is expecting leniency, hoping for a lesser sentence. He will be prosecuted by the  the powers in Bossier for that and that may be something that would be on his mind when he goes to court. So his expectations of leniency would, in my opinion be a challenge for cause.
(R., vol.XII, pp. 2905-06).
The State responded that the municipal authority in Bossier City, not the District Attorney's Office for Bossier Parish, would prosecute Roshto and that he had "no authority over the city attorney's office." (R., vol.XII, p. 2906). Ultimately, the trial court allowed defendant to recall Roshto and when defense counsel asked point-blank whether he expected leniency for his pending charges if the jury returned a guilty verdict and/or imposed the death penalty, he responded, "It had never crossed my mind until you just brought it up." (R., vol.XII, p. 2911). Later, Roshto explained he hired an attorney before he had even been summoned for jury duty and that he "wouldn't expect the [c]ity or the [s]tate to get together to try to help me out because I'm expecting my lawyer to do that with the [c]ity or whoever for me." (R., vol.XII, p. 2912). In the end, the trial court reseated Roshto on the venire and he served as a juror in the case.
Although the prospective juror stated unequivocally he did not expect any favorable treatment from the State in exchange for his service, defendant nonetheless maintains that "after the issue had been raised ..., there could be little question that the seed of temptation for such an exchange was firmly planted in Roshto's mind...." Brief for Appellant, p. 25. Accordingly, comparing Roshto's predicament to that of a State witness, defendant claims the trial court erred when it denied his challenge for cause. Cf. State v. Williams, 02-1406 (La.4/9/03), 844 So.2d 832, 835 (per curiam) ("[w]itness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct.").
We find the trial court did not abuse its discretion when it denied the cause challenge. The juror stated he did not expect leniency on the pending DWI charge in exchange for his service on the jury and he appeared to have no prior relationship with the district attorneys prosecuting the case. Notably in situations in which prospective jurors have given the appearance of being more indebted to the State, this Court has held the trial judge did not err when denying the defense challenges for cause. See e.g., Bourque, 622 So.2d at 229 (no abuse of discretion when trial court denied challenge for cause to juror previously charged with petty theft and who agreed that district attorney had done him a favor by allowing him to pay a fine rather than risk jail time); State v. Lee, 559 So.2d 1310, 1317 (La.1990) (fact that juror had previously hired district attorney on unrelated legal matter and stated that he might do so in the future insufficient basis to grant challenge for cause absent a showing that relationship with prosecutor would influence his deliberations). This claim lacks merit.
C. Debra Pijanowski. Finally, defendant claims the trial court erred when it denied his challenge for cause to prospective juror Debra Pijanowski.[21] Pijanowski stated she was the daughter of a retired Bossier City policeman; had recently graduated with a bachelor's degree in natural sciences; and had spent two years conducting DNA investigative work and analysis. She also indicated she had divorced in 1982 from a physically *1082 abusive husband who "drank a lot." After Pijanowski stated she could consider both life imprisonment and the death penalty as punishments for first-degree murder, defense counsel sought to probe further about her views on capital punishment and she responded, "You know, I think we have the death penalty as law to use as a deterrent so that people don't act like wild animals. Obviously, people still act like wild animals today. But it's part of the law and I would consider it. It's  It's in the law." (R., vol.X, pp. 2449-50).
Defendant challenged the juror on several grounds, arguing:
She indicated that her father was a retired Bossier City Police Officer after twenty years. She had also had a husband who drank a lot and was abusive to her and that we thought she might not be able to properly and adequately consider the mitigating circumstance, intoxication. And then she had also during her questioning referred to defendants and murder cases or some cases as wild animals.
(R., vol.XI, pp. 2700-01).
The trial court denied the challenge, stating:
[T]he fact that somebody is the victim of a crime does not necessarily exclude them. This is not a situation of someone abusing his wife. She testified under oath that she could consider those. I believed her. I thought she was open and honest. She may be a little radical in some of her beliefs, but she's entitled to those beliefs and did not, in my opinion rise to a level that would allow her to be determined to be impartial [sic], and for that reason the challenge for cause was [sic] denied.
(R., vol.XI, p. 2701).
Defendant fails to show any abuse of discretion under LA.CODE CRIM. PROC. ANN. art. 797. Pijanowski stated that despite her father's former employment in law enforcement, she would not impute a greater weight to a police officer's testimony than that provided by a lay witness. Whatever expertise the juror possessed in DNA analysis and testing similarly does not provide any basis for her removal for cause. Because of Pijanowski's experience with an abusive alcoholic ex-husband some 20 years before defendant's trial, the prospective juror stated she would consider a defendant's intoxicated state as a mitigating factor.
As to Pijanowski's purported predisposition to vote for the death penalty, the proper standard for determining when a prospective juror may be excluded for cause because of the juror's views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841, (1985); State v. Sullivan, 596 So.2d 177 (La.1992), rev'd. on other grounds sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182(1993). The basis of the exclusion under LA.CODE CRIM. PROC. ANN. art. 798(2)(a)and (b), which incorporate the standard of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776(1968), as clarified by Witt, is that the juror would either "automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him ...," or that the juror's attitudes towards the death penalty "would prevent or substantially impair him from making an impartial decision ... in accordance with his instructions and his oath...." In a "reverse-Witherspoon" context, the basis of the exclusion is that the juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before *1083 him...." State v. Robertson, 630 So.2d at 1284.[22] If a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993).
Our careful review of the record shows that although Pijanowski stated she was "glad" the death penalty was an option in certain cases, she steadfastly maintained she would not be predisposed to voting for either life imprisonment or death until she considered the facts of the case. Accordingly, the trial court did not abuse its discretion when it denied the defense challenge for cause. This argument lacks merit.

Jury Selection: Batson challenges
Defendant alleges the State exercised its peremptory challenges in a manner aimed to exclude prospective African-American jurors thereby violating Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69(1986).
Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the State used its peremptory challenges to exclude potential jurors on account of race. The burden of production then shifts to the State to come forward with a race-neutral explanation, and if a race-neutral explanation is tendered, the trial court then must decide, in step three, whether the defendant has proven purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (Per Curiam); see State v. Collier, 553 So.2d 815 (La.1989). The second step need not demand an explanation that is persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Purkett, 514 U.S. at 767, 115 S.Ct. 1769. The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Id.; see Batson; Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395(1991). A trial court's determination pertaining to purposeful discrimination rests largely on credibility evaluations, and is thus entitled to great deference by the reviewing court. Batson, 476 U.S. at 99, 106 S.Ct. 1712, n21.
In the case sub judice, the trial court entertained the State's race-neutral reasons for the exclusions without making a finding of whether defendant had made a prima facie showing of purposeful racial discrimination. In this situation, the issue of whether the defense established a prima facie case of discrimination is moot. See State v. Green, 94-0887, p. 25 (La.5/22/95), 655 So.2d 272, 288 (applying Hernandez, 500 U.S. at 352, 111 S.Ct. 1859, and concluding that once the trial court has demanded race-neutral reasons for his peremptory strikes from the prosecutor, the issue of a prima facie case of discrimination becomes moot). The equal protection *1084 analysis in the present case therefore begins with Batson's second step in which any response will qualify as race-neutral "unless a discriminatory intent is inherent in the prosecutor's explanation." Hernandez, 500 U.S. at 352, 111 S.Ct. 1859.
A. Anthony Moss: With regard to prospective juror Moss, the State explained he had played college football at Louisiana State University and later professional football in the National Football League and he was concerned about the prospect of having a seated juror who had experienced the lifestyle of a professional athlete. More importantly, it stated Moss indicated he would require something greater than proof beyond a reasonable doubt before voting to sentence defendant to death.
B. Linda Sue Stevenson: As to venire person Stevenson, the State noted she had indicated her brother had been murdered 25 years ago and that the assailant had not been caught. Stevenson also stated she had two nephews who had been convicted for narcotics-related offenses and two brothers who had been arrested for DWI. Finally, the State claimed the prospective juror stated she had two children who were roughly the same age as defendant.
The trial court found the State's race-neutral reasons for excusing Moss and Stevenson sufficient and overruled defendant's Batson objection without further explanation.
C. Jacqueline Taylor: Finally, the trial court entertained defendant's objection to the State's use of a peremptory challenge to excuse Jacqueline Taylor. The State explained Taylor had several family members who had been convicted of crimes, among them a brother who had a murder conviction. The State also expressed concern because Taylor had indicated her relatives had sought revenge against an assailant after she had been the victim of an armed robbery. The State further noted the prospective juror had children who were the same age as defendant. Again, the trial court accepted the State's race-neutral explanation for excusing Taylor and overruled the defense objection.
Defendant claims the trial court should not have accepted the State's race-neutral explanations because the State did not exercise peremptory challenges to Caucasian jurors whose responses during voir dire were similar to those recited by the State as reasons for excusing Moss, Stevenson and Taylor.
From the outset, we note the record does not suggest the State exercised a disproportionately high percentage of its peremptory challenges to excuse African-American jurors. Rather, of the 93 venire persons examined in defendant's case, 13 were African-Americans. Eight of those 13 jurors were successfully challenged for cause. Of the five remaining, the State exercised three of its 11 peremptory challenges to remove the prospective jurors. At the beginning of trial, one African-American juror sat on the jury and another served as an alternate. However, when one seated Caucasian juror was excused for medical reasons during trial, the African-American alternate took her place and thus two African-Americans were among the panel of 12 that unanimously convicted defendant of first-degree murder and sentenced him to death. Cf. State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, 141 (acknowledging that "[a]lthough the mere presence of African-American jurors does not necessarily defeat a Batson claim, the unanimity requirement of a capital case sentencing recommendation may be considered."). Accordingly, although the trial court required the State to provide race-neutral explanations for the use of those peremptory challenges it exercised *1085 to remove prospective African-American jurors rendering the threshold Batson issue moot, we do not find defendant made a prima facie showing of discrimination.
Notwithstanding, defendant fails to show the trial court abused its discretion. The State accurately described the venire persons' responses during voir dire when explaining to the trial court why he had challenged them.[23] Although the State may have accepted Caucasian jurors possessing some of the same characteristics the State cited as reasons for exercising the peremptory challenges to the excused jurors, given every venire member's unique responses, defendant fails to show the trial court erred when it accepted the race-neutral explanations. Cf. State v. Collier, 553 So.2d 815, 822 (La.1989) ("[T]he fact that a prosecutor excuses one person with a particular characteristic ... and not another similarly situated person does not in itself show that the prosecutor's explanation was a mere pretext for discrimination. The accepted juror may have exhibited traits which the prosecutor could have reasonably believed would make him desirable as a juror.")(emphasis added). Notably, the State's peremptory challenges based on the body language of jurors alone have survived Batson challenges when accepted by a trial court, who possesses broad discretion in making the ultimate factual determination regarding purposeful discrimination. See, e.g., United States v. Bentley-Smith, 2 F.3d 1368, 1375 (5th Cir.1993) ("The reason certainly is stronger if the attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated .... [but] the judge is free, based upon all the information presented and that judge's eyewitness observation of counsel, to conclude that the reason is offered in good faith and not as a subterfuge for race."). The trial court may consider in this context the legitimacy of the State's race-neutral reasons for excluding other prospective jurors. Hernandez, 500 U.S. at 370, 111 S.Ct. 1859.
In this case, no record evidence rebuts the determination of the trial court that the State's expressed reasons for exclusion were non-pretextual and legitimate grounds for exercise of the challenges against the three African-American jurors excused. This argument lacks merit.

Sufficiency of the evidence: aggravated kidnapping
Defendant claims the State presented insufficient evidence to prove the intentional murder occurred during the perpetration of an aggravated kidnapping. Although defendant tacitly concedes the evidence sufficed to prove other felonies relied upon by the State to support its first-degree murder charge,[24] because the *1086 jury relied on aggravated kidnapping as the only felony aggravating circumstance when returning its death verdict in the penalty phase, see infra, defendant argues it must necessarily have relied on that felony to find him guilty of first-degree murder. As a result, defendant claims the first-degree murder verdict during the guilt phase must be vacated.
In State v. Wright, 01-0322 (La.12/4/02), 834 So.2d 974, cert. denied, 540 U.S. 833, 124 S.Ct. 82, 157 L.Ed.2d 62 (2003), this Court rejected the defendant's claim it must vacate his first-degree murder conviction because one of the aggravating circumstances the jury found at the penalty phase was not supported by the evidence and was also relied upon by the State to prove him guilty of first-degree murder. Reviewing the United State's Supreme Court's jurisprudence on the issue in Wright, we stated:
In Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), the Supreme Court held that when a jury's general verdict could have rested on a constitutionally invalid basis as well as a valid basis, and the reviewing court cannot determine which basis led to the verdict, under an instruction that either ground may independently support the verdict, the defendant's conviction must be set aside. However, in Griffin v. U.S., the Court held that the holding of Stromberg did not require a guilty verdict to be set aside when one of the possible bases of a conviction was not constitutionally invalid, but was merely unsupported by sufficient evidence. 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1992).
Wright, 834 So.2d at 987.
Hence, even assuming the State presented insufficient evidence to prove the underlying offense of aggravated kidnapping during the guilt phase of this prosecution, we need not disturb the first-degree murder conviction rendered under a general verdict which did not specify the basis of the jury's finding of guilt. Our careful review of the record shows the evidence clearly sufficed to prove defendant was engaged in the perpetration of an aggravated burglary, armed robbery, and second-degree kidnapping when he intentionally killed the victim. LA.REV.STAT. ANN. § 14:30.1. Accordingly, we find no merit in defendant's contention that his first-degree murder conviction, the product of the guilt phase, should be vacated.

The trial court erred when it allowed the State to introduce DNA evidence.
Defendant claims the trial court erred when it ruled admissible DNA evidence because the State failed to establish the reliability of its database.
LA.REV.STAT. ANN. § 15:441.1, provides in part, that:
[e]vidence of deoxyribonucleic acid profiles, ... offered to establish the identity of the offender of any crime is relevant as proof in conformity with the Louisiana Code of Evidence.
The Louisiana Legislature clearly intended this type of evidence to be admissible absent a particularized showing that the evidence is unreliable. This Court has adopted the reasoning and observations set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which specifically rejected the "general acceptance" test and outlined the means for determining the reliability and answered many questions as to proper standards for the admissibility of expert scientific testimony. State v. Foret, 628 So.2d 1116, 1122 (La.1993). In Daubert, the Supreme Court stated that an inference or assertion of scientific knowledge must be derived by the scientific method. Proposed testimony must be supported by appropriate validation, i.e., "good grounds," based on what *1087 is known. Daubert, 509 U.S. at 590, 113 S.Ct. 2786. In short, evidentiary reliability will be based on scientific validity. Id., 509 U.S. at 590, 113 S.Ct. 2786, n9. The trial court must determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. The trial court must make "a ... preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue. Many factors will bear on the inquiry...." Id., 509 U.S. at 592-93, 113 S.Ct. 2786 "General acceptance" can have a bearing on the issue. Id., 509 U.S. at 594, 113 S.Ct. 2786.
At the pre-trial hearing and at trial, the State expert, Michelle Gaines,[25] testified she performed DNA analysis on a pair of gloves found in the ditch opposite the point where Chreene found the victim's car, cigarette butts from the victim's driveway, defendant's bloodstained jeans, and from some swabs taken from inside and outside the victim's vehicle. Gaines compared these results with reference samples taken from defendant, the victim, Lance Malone (the victim's son), Andrew Lee "J.R." Brantley, Jr., Shawn Minnifield[26] and Richard Stanford.[27]
Gaines testified the victim could not be excluded as the donor of the blood found on defendant's jeans, swabs from the car and the outside of the glove. Gaines further claimed the likelihood of another Caucasian contributor was approximately one in 48.9 quadrillion. In addition, DNA was extracted from inside the glove which revealed three donors. Defendant and the victim could not be excluded as two of the donors while the remaining individuals who submitted reference samples were excluded as possible sources. When questioned about the third donor of DNA on the inside of the glove, Gaines described that individual as a weak contributor, one that contributed less DNA than the other two. When queried further about the weak contributor, Gaines said this DNA could have been contributed by "anyone who had handled those gloves probably fairly recently, if someone else had worn them at some point in time, it would be possible that I am getting some or a small amount of their DNA in this sample." (R., vol.XIV, p. 3408). Gaines also testified that the test results revealed that the profile obtained from inside the glove was approximately 4.9 million more times as likely to have been a mixture of DNA from defendant, the victim, and an unknown African-American male than a mixture of DNA from the victim and two unknown African-American men.
Defense counsel was free at trial to challenge the accuracy of the database used when the expert made her calculations. At the hearing on the issue, Gaines testified a computer program was used to calculate the frequency rates of specific DNA profiles appearing in various populations and that the program was available to the defense in discovery. In addition, the witness testified the North Louisiana Criminalistics Laboratory had been certified to *1088 conduct DNA testing and analysis. In this situation, defendant fails to show the trial court erred when it admitted the DNA evidence. This argument lacks merit.

The State presented insufficient evidence to sustain the conviction because it did not exclude every reasonable hypothesis of innocence.
In this argument, defendant claims the State presented insufficient evidence to sustain the conviction because it could not conclusively link all the DNA extracted from various items of evidence to him. As a result, he contends questions about the killer's identity remain unanswered and accordingly argues the State failed to exclude every reasonable hypothesis of his innocence.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). Further, when the conviction is based upon circumstantial evidence, LA.REV.STAT. ANN. § 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. State v. Camp, 446 So.2d 1207, 1209 (La.1984); State v. Wright, 445 So.2d 1198, 1201 (La.1984). However, LA.REV.STAT. ANN. § 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt standard; it is merely an evidentiary guide for the jury when considering circumstantial evidence. State v. Porretto, 468 So.2d 1142, 1146 (La.1985).
In this case, despite defendant's claims to the contrary, the portion of the State's DNA evidence that did not conclusively point to him as the victim's murderer did nothing to undermine the much greater portion of its evidence, scientific and otherwise, that placed him at the crime scene and implicated him as the sole assailant. This argument lacks merit.

The trial court erred when it qualified a State witness with limited experience as an expert in blood spatter analysis.
Defendant claims the trial court erred when it qualified Shreveport Police Department Lieutenant Mark Rogers as an expert in crime scene analysis with a sub-specialty in blood spatter analysis. Accordingly, he contends the witness should not have been permitted to testify that the blood spatter pattern on defendant's jeans suggested the person wearing them may have straddled the victim and in any event was within three feet of her when she was repeatedly struck.
Experts may qualify by virtue of "knowledge, skill, experience, training, or education...." LA.CODE. EVID. ANN. art. 702. A trial judge is vested with broad discretion in determining whether a witness is an expert, and in the absence or abuse of discretion, a reviewing court will not disturb the district court's decision. Bourque, 622 So.2d at 237; State v. Trahan, 576 So.2d 1, 8 (La.1990).
In this case, Lieutenant Rogers testified he was the commander of the crime scene investigations unit of the Shreveport Police Department. He had previously been accepted 41 times as an expert in crime scene analysis and reconstruction. While the officer had not published any material on blood spatter analysis, he testified he had conducted three seminars in the field. In addition, he had attended FBI seminars which included presentations on blood spatter analysis. Finally, the officer stated he had taken at least two 40-hour seminars devoted solely to blood spatter analysis.
Given the expert's training and experience, defendant fails to show the trial *1089 court abused its discretion when it qualified Lieutenant Rogers as an expert in the field. See e.g., State v. Young, 95-0402 (La.App. 3 Cir. 10/4/95), 663 So.2d 301, 303 (witness accepted as crime scene investigation and blood spatter expert based on four years experience, various classes and seminars and qualification as expert in other parishes); State v. Howard, 626 So.2d 459, 464 (La.App. 3 Cir.1993) (witness accepted as blood spatter expert; ten or more years of work in area, attended several courses, and lectured in the field).
Moreover, the trial court instructed the jury that it "alone shall determine the weight and credibility [Rogers's] testimony deserves." (R., vol.XIV, p. 3437). In addition, the witness was subject to cross-examination by the defense concerning both his qualifications and the conclusions drawn from his analysis of the blood spatter patterns. In these circumstances, defendant fails to show the likelihood of prejudice resulting from the trial court's ruling qualifying the witness as an expert. This argument lacks merit.

The trial court read an erroneous instruction on the law of principals.
Defendant claims the trial court's instruction on the law of principals allowed the jury to convict him of first-degree murder absent a finding that he specifically intended to kill (or inflict great bodily harm to) the victim.
The trial court instructed the jury at the conclusion of the guilt phase that "all persons concerned in the commission of a crime, whether present or absent and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime are principals." (R., vol.XV, pp. 3522-23). Later in its charge, the trial court read the jury the definition of first-degree murder, which it correctly defined as "the killing of a human being ... when the offender has the specific intent to kill or inflict great bodily harm and in addition is engaged in the perpetration or attempted perpetration of... second degree kidnapping ... or aggravated burglary." (R., vol.XV, p. 3527). Still later, it instructed the jury that to convict defendant of first-degree murder it "must find that the defendant killed Mary Ann Malone" and "defendant acted with a specific intent to inflict great bodily harm and was in engaged in the perpetration or attempted perpetration of ... second degree kidnapping ... or aggravated burglary." (R., vol.XV, p. 3527).
As an initial matter, the record shows defendant did not contemporaneously object to the instruction and thereby waived any claim based on it. LA.CODE.CRIM. PROC. ANN. art. 841. Nevertheless, considering that after it defined the law of principals, the trial court twice charged the jury that to convict defendant of first-degree murder it was required to find he possessed specific intent, it is unlikely the jury misunderstood the trial court's charges. This argument lacks merit.

The short form indictment denied defendant due process.
Defendant alleges the State's indictment provided him with insufficient notice of the crime charged because it did not indicate the underlying circumstances upon which the State relied to support the first-degree murder charge.
The time for testing the sufficiency of an indictment or bill of information is before trial by way of a motion to quash or an application for a bill of particulars. State v. Gainey, 376 So.2d 1240, 1243 (La.1979). A post-verdict attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense. State v. Williams, 480 So.2d 721, 722, n1 (La.1985); LA.CODE.CRIM. PROC. ANN. art.
*1090 465 Official Revision Comment (a). Because defense counsel failed to file a motion to quash, we find defendant waived any claim based on the allegedly defective indictment.
Notwithstanding the procedural bar to the claim, the Louisiana Constitution of 1974 provides an accused shall be informed of the nature and cause of the accusation against him. LA. CONST. ANN. art. I, § 13. LA.CODE CRIM. PROC. ANN. art. 464 implemented that requirement. It provides:
The indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
LA.CODE CRIM. PROC. ANN. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including first-degree murder. This Court has consistently upheld the constitutionality of the short form indictments. State v. Baylis, 388 So.2d 713, 718-19 (La.1980); State v. Liner, 373 So.2d 121, 122 (La.1979), and authorities cited therein; but see Liner, supra, 373 So.2d at 123, (Calogero, J., dissenting). When those forms are used, it is intended a defendant may procure details as to the statutory method by which he committed the offense through a bill of particulars. Baylis, 388 So.2d at 719; State v. Johnson, 365 So.2d 1267, 1270-71 (La.1978); LA.CODE CRIM. PROC. ANN. art. 465 Official Revision Comment (a).
In the present case, the State charged defendant by bill of indictment, which read, in pertinent part, that "Jeremiah D. Manning ... on or about the 18th day of December ... in the Parish [of Bossier] ... did commit first (1st) degree murder upon Mary Ann Malone, in violation of the provisions of LRS 14:30." (R., vol.I, p. 19). Accordingly, defendant was charged in compliance with LA.CODE CRIM. PROC. ANN. art. 465(A)(31), which provides as a short form indictment for first-degree murder: "A.B. committed first degree murder of C.D." See State v. Neslo, 433 So.2d 73, 81-82 (La.1983). This argument lacks merit.

PENALTY PHASE

The trial court erred when it allowed the introduction of inadmissible evidence concerning a juvenile kidnapping adjudication at the penalty phase and the State's repeated references to the inadmissible evidence introduced an arbitrary factor into the jury's sentencing deliberations.
Defendant contends the trial court erred when it permitted the introduction of inadmissible and unreliable other crimes evidence at the penalty phase. Defendant claims the introduction of inadmissible testimony and the State's closing argument focusing on the inadmissible evidence introduced an arbitrary factor into the sentencing proceedings, requiring reversal of the jury's sentence of death. See State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 928, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000) ("In the context of Rule 28 review, the existence of an arbitrary factor requires this Court to find an error of such magnitude that it undermines confidence in the jury's sentencing verdict....").[28]

*1091 A. The trial court erred when it permitted the State to introduce evidence supporting a conviction for a more serious offense than that which defendant had been adjudicated delinquent.
Defendant first alleges the trial court erred when it allowed the State to present evidence at the penalty phase concerning a juvenile incident in which he forcibly entered a woman's vehicle and threatened her with a fingernail file.[29]
The State filed its notice of intent to introduce other crimes evidence at the penalty phase on January 28, 2002, stating, inter alia, that it sought "to introduce evidence of defendant's adjudication as [a] delinquent [for] ... simple kidnapping in Docket No. J1621...." (R., vol.II, p. 396). This juvenile adjudication occurred approximately five years prior to the present offense.
On May 7, 2002, before the penalty phase commenced, the trial court held a hearing (outside the presence of the jury) to determine the admissibility of the evidence. The sole witness to testify at the hearing, was the victim of the crime, Carey Chandler. She testified defendant approached her at the supermarket and asked her to drive him to a friend's home. When Chandler refused, defendant jumped in the vehicle as she unlocked its doors, grabbed her arm, and pulled out what she thought was a knife. Chandler complied with defendant's demand and drove a brief distance in the purported direction of his friend's house. Then, the witness testified, ".... I got mad and I saw a man coming out of the movie store, so I ... pulled in right there and I slammed ... on my brakes and I started hollering and screaming and started jumping out of the car and he jumped out of the car and ran." (R., vol.XV, p. 3572). She continued that she was frightened because defendant "had a weapon at my wrist and I was scared he was just going to slash my wrist at any time." Id. After Chandler identified defendant in court as her assailant, the trial judge questioned her, asking if the defendant had wielded the weapon "in the manner that you felt that he could inflict great bodily harm if you did not comply?" (R., vol.XV, p. 3574). When the witness responded affirmatively, the State ceased its presentation of evidence and argued:
Your Honor, at this time, if the [c]ourt would allow, that would be the testimony and the evidence that we would like to submit for the jury, without submitting any documentation as to the actual adjudication of that offense.
(R., vol.XV, p. 3574).
Defense counsel objected, stating that because defendant had only been adjudicated delinquent of simple kidnapping, the State should not be permitted to "come in here and have a second trial, right here as part of the penalty phase in this case." (R., vol.XV, p. 3575). The defendant asserted that the jury only needed to know there had been a juvenile adjudication of simple kidnapping and nothing more.
The trial court ruled the witness could testify about the incident, reasoning as follows:

*1092 [I]t's my understanding of my reading of Article 1104 of the Code of Evidence, State v. Jackson and State v. Comeaux that as long as the state does not introduce evidence of that adjudication, but offers evidence of the offense itself  and again, that adjudication is for delinquent behavior and not for some specific charge. I believe the Juvenile Code specifically says that you don't find juveniles guilty of crimes. You find them to be delinquent. And unlike an adult adjudication, this is a little different. And I'm treating it under these circumstances as an unadjudicated criminal  juvenile offense that could have been at the time the indictment was handed down in this case, could have still been transferred to adult court and would fall within the permissible other crimes evidence that can be submitted at the penalty phase of a capital case.
(R., vol.XV, pp. 3577-78).
The witness provided testimony at the penalty phase similar to that at the hearing on the matter. Specifically, on direct examination Chandler testified defendant approached her at the supermarket and asked if she would drive him to a friend's house. She explained she was traveling in a different direction and walked to her car. However, when she inserted the key to open her car door, the key automatically unlocked the passenger door and defendant entered the vehicle and "put what [she] thought was a knife to" her. (R., vol.XV, p. 3644). Chandler further stated, "I was afraid that he was either going to stab me or slash my wrists or slash my throat." (R., vol.XV, p. 3645). The witness stated that when she saw a man exiting a video store, she drove up to him, slammed on her brakes and exited her vehicle "hollering and screaming." Id. This successfully frightened defendant, who jumped out of the vehicle and ran away.
On cross-examination, the witness stated she later learned defendant had not been armed with a knife, but rather with a file from either a pair of toenail or fingernail clippers. She also stated she had not suffered any physical injuries as a result of the encounter.
Defendant first claims the trial court erred when it admitted the testimony at the penalty phase, demonstrating defendant was armed with the fingernail file during the commission of the offense.
Capital sentencing hearings shall focus on the circumstances of the offense, the character and propensities of the offender and the impact that the death of the victim has on family members. LA.CODE CRIM. PROC. ANN. art. 905.2. In State v. Jackson, 608 So.2d 949, 954 (La.1992), this Court declared "evidence of convictions of serious unrelated crimes is extremely relevant to the character and propensities of the defendant." However, while the State may introduce evidence of a capital defendant's unrelated convictions at the penalty phase, there exists a point at which the sheer magnitude and detail of the evidence, although highly probative, impermissibly shifts the jury's focus away from its primary function of determining the appropriate sentence for this offense and this offender. State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, 22, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998). In fact, Jackson specifically limited "the evidence supporting a prior conviction to the document certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime." Jackson, 608 So.2d at 954. "This limitation ... prohibit[s] witness testimony relevant to the original offense of which the defendant was charged in an unrelated matter and to which the defendant pleaded guilty to a lesser offense." State v. Langley, *1093 94-0999 (La.4/21/94), 639 So.2d 211, 212, citing Jackson.
In the case sub judice, we find the trial court erred when it concluded evidence that defendant had been adjudicated delinquent differed from a criminal adult conviction because of the purportedly non-criminal nature of juvenile proceedings and hence admitted testimony supporting a greater charge.[30] In Jackson, this Court rejected the defendant's contention that juvenile adjudications should be per se inadmissible at the penalty phase, but rather "conclude[d] that the limitation on the nature of the offense that has been imposed by this opinion on the use of district court convictions in capital sentencing hearings is adequate to safeguard against the injection of an arbitrary factor in the jury's sentencing deliberations...." Id., 608 So.2d at 956. Based upon this language we find delinquency adjudications should be governed by the same rules as adult felony convictions  if the defendant pled guilty to a lesser offense, witness testimony relevant to the original charge is prohibited.[31]
LA.REV.STAT. ANN. § 14:45 defines simple kidnapping in pertinent part as the "intentional and forcible seizing and carrying of any person from one place to another without his consent." In contrast, LA.REV.STAT. ANN. § 14:44.1(A)(5) defines second-degree kidnapping as "the forcible seizing and carrying of any person to go from one place to another ... when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon."[32] Given the testimony that defendant was armed with the fingernail file during the abduction, the evidence presented to the jury during the penalty phase established defendant had committed second-degree kidnapping. The trial court thus erred when it allowed the witness to make any references to the weapon defendant wielded during the incident. Nevertheless, we find it extremely unlikely the State's presentation of evidence that defendant was armed with the fingernail file when he entered Chandler's car had any effect on the jury's verdict at sentencing in the present case which involved defendant's use of a knife.
Defendant further maintains the State's repeated references to the incident during closing argument disingenuously suggested *1094 to jurors the offense constituted a "test run" for the instant crime and portrayed him "as a would-be serial murderer" which introduced an arbitrary factor during the jury's deliberations at the penalty phase. Brief for Appellant, pp. 38, 42.[33]

B. The State compounded the trial court's error by its improper penalty phase argument that the juvenile offense constituted an unsuccessful "test-run" for the victim's abduction and murder.
In addition to presenting the inadmissible evidence that defendant was armed during the offense, defendant contends the State focused on the incident during its argument at the penalty phase. Indeed, as defense counsel argued, the State made several comparisons between the Chandler crime and the instant offense, arguing:
[Defendant] was also involved in other criminal activity that you heard about; Carey Chandler. And we'll get into that in just a moment; a situation that could have been somewhat similar to this. And that occurred in 1996, when he was a juvenile.
(R., vol.XV, pp. 3703-04).
Later in closing argument, the State continued:
[D]uring the guilt phase[,] [y]ou didn't know about Carey Chandler. You heard and saw the effects that Mr. Manning had on that four foot, eleven (4' 11"), hundred, eighteen (118) pound young lady. Just spending a moment with him can cause a lot of emotional trauma. What did he do? Got into her car without her authority and held a dangerous weapon on her. Defense counsel said, oh it wasn't anything but a nail file or toenail clippers. In the hands of that man, anything in that manner is a dangerous weapon. We've seen what he can do with a table knife. What do you think he could have done with a toenail clipper or a nail file or a pocket knife.... He got in that car and held that dangerous weapon on her and she told you she was scared. And made her go from one place to another. It was even in the same direction.
(R., vol.XV, pp. 3715-16).
Finally, in its rebuttal argument, the State again referenced the Chandler offense:
This is Mary Ann Malone after that six foot, three (6'3%"), two hundred, thirty (230) pound man took her from her home December 18, 2000. What do you think was going through her mind on that dirt road? Carey Chandler gave you a hint.
(R., vol.XV, p. 3723).
Defendant further claims the State misled the jury when examining the witness *1095 when it suggested that when he abducted Chandler, his intent was to force her to drive to Highway 160, the road off of which the victim's body was found in the present case.[34] If jurors accepted that suggestion, they could have logically inferred that Chandler would have met a similar fate as the victim had she not escaped shortly after the encounter. Defendant maintains that Highway 160 was more than 10 miles from where the abduction of Chandler both began and ended and hence any suggestion he intended to bring her to the same area as the victim in the instant case was purely speculative.
Even accepting defendant's claim that the State was suggesting he intended to force Chandler to drive to the area where the victim's body was discovered, on cross-examination, defense counsel established she had only driven two blocks before she made her escape and they had not even turned toward Highway 160 at that time.[35] Moreover, because the incident involving Chandler occurred five years before the victim's murder, and the latter crime began as a home invasion, it is extremely unlikely jurors concluded the former incident had been a "test-run" for the victim's murder. Accordingly, defendant fails to show he suffered any prejudice resulting from the prosecutor's purportedly disingenuous examination of the witness.
Finally, defendant claims the State exacerbated the prejudice when it violated the "golden rule" during the closing argument of the penalty phase by asking jurors to imagine what the victim was thinking during the abduction and murder. He specifically points to the following comments as being improper:
What do you think was going through her mind on that dirt road? Carey Chandler gave you just a hint. We could never imagine what was going through this lady's mind as she was forced to drive, without glasses, for seventeen (17) miles on that isolated area, knowing  knowing  what was going to take place. And forced to endure the beating and pitiless infliction of unnecessary pain. He could have killed her. He did not have to beat her the way he did. I, too ask: what do you think was going through that poor lady's mind when she's out on that dirt road on a cold, cold night; and the last thing she sees is that huge man beating her and beating as her blood spattered all over his jeans; as her lung collapsed because her ribs were puncturing it; and her skull was split; and her nose was broken.
(R., vol.XV, pp. 3723-24).
In State v. Wessinger, 98-1234(La.5/28/99), 736 So.2d 162, 187, cert. denied, sub nom., Wessinger v. Louisiana, *1096 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999), this Court held that remarks in which the State urged jurors to put themselves in the victim's position just before he or she died and to show the defendant no more mercy than he showed the victim, while arguably improper, were not so prejudicial that it would befuddle jurors into disregarding the law as given to them by the trial judge. See also State v. Monroe, 397 So.2d 1258, 1271 (La.1981), cert. denied, 463 U.S. 1249, 104 S.Ct. 36, 77 L.Ed.2d 1455 (1983), (this Court criticized the "eye for an eye, a tooth for a tooth" argument as improper but found no reversible error since the argument when considered as a whole lost "much of its objectionable flavor"). Similarly, in the present case, while the State's argument speculating on the victim's fear before she was murdered bordered on improper, the remarks did not urge the jury "to disregard the law as given to it in the instructions of the trial court." Id. Therefore, this claim lacks merit.
In summation, we find the admission of the evidence concerning the fingernail file, both standing alone and in conjunction with the State's references to the incident during the closing argument, did not introduce an arbitrary factor into the jury's sentencing deliberations. Evidence of the Chandler incident was clearly relevant to demonstrate the character and propensities of the defendant. LA.CODE CRIM. PROC. ANN. art. 905.2. In addition, notably, defense counsel failed to object to any portion of the closing argument, suggesting he did not find it overtly prejudicial at the time. See State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 375, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996); see also Wessinger, 736 So.2d at 181.[36] This argument lacks merit.

The trial court erred when it allowed the experts to testify concerning inadmissible evidence at the penalty phase.
Defendant claims the State introduced other inadmissible evidence at the penalty phase which interjected an arbitrary factor into the jury's sentencing deliberations and hence requires reversal of the death verdict. He relies on three aspects of expert testimony elicited during the examination of expert psychiatrists: evidence of an alleged arson and escape; evidence demonstrating defendant exercised his right to remain silent; and, evidence concerning defendant's sanity at the time of the offense.
The record shows that at the sentencing phase, defendant presented mitigation expert testimony from Dr. Paul Ware, who qualified without objection as an expert in forensic psychiatry. The witness testified he examined defendant at the Caddo Correctional Center ("CCC") on March 29, 2001, to evaluate both his capacity to proceed and "to determine his psychiatric state or his mental state at the time of the charge against him or how he was functioning at the time he was arrested for the charge." (R., vol.XV, p. 3668). Ware testified he performed a psychiatric evaluation and diagnosed defendant with polysubstance abuse, based on his history of alcohol and Xanax[37] ingestion. The doctor *1097 also stated defendant functioned at a slow learner level and was possibly mildly retarded. The witness believed defendant minimized his alcohol problems, which may have stemmed from a genetic predisposition. At the conclusion of the expert's testimony, defendant introduced a copy of Dr. Ware's evaluation, which indicated, inter alia, that he had been diagnosed as a slow learner with a substance abuse problem.

A. Evidence of an alleged arson and escape.
In the first portion of this argument, defendant complains the State elicited information on cross-examination indicating defendant had been arrested when he was about nineteen (19) for arson and that he had remained in jail for two months before the charges were dropped. In addition, when asked why defendant was housed at CCC, Dr. Ware responded that he had "been told that he was considered to be an escape risk and dangerous." (R., vol.XV, p. 3674). Defendant asserts this testimony exceeded the scope of his direct examination and constituted the introduction of otherwise inadmissible other crimes evidence.
Despite defendant's contention in this regard, our review of the record shows the State's cross-examination was based only on information contained in Dr. Ware's report, which the defense introduced into evidence during its case-in-chief. In this manner, the defense opened the door to the otherwise prohibited testimony. See State v. Edwards, 420 So.2d 663, 675 (La.1982), citing State v. Lane, 292 So.2d 711 (La.1974); State v. Betancourt, 351 So.2d 1187 (La.1977); see also Cmt. (o) to LA.CODE EVID. ANN. art. 607 (new evidence code does not change the traditional policy, based on waiver and fair play, permitting freer admissibility of extrinsic evidence after an adverse party has "opened the door" to otherwise inadmissible evidence). As such, the cross-examination did not exceed the scope of the defendant's presentation of evidence on direct examination. This portion of the argument lacks merit.

B. Evidence demonstrating defendant exercised his right to remain silent.
Next, defendant complains because the State questioned Dr. Ware about information contained in the report which indicated that acting on his counsel's advice, defendant declined to discuss the circumstances of the offense with the doctor. Again, however, the defense introduced the report into evidence and hence the State was entitled to cross-examine the witness about the information contained in it. Contrary to defendant's assertion, the evidence in no way violates the rule set out in Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which bars the State's use of an accused's post-Miranda silence to impeach his exculpatory account at trial. Id. ("Every post-arrest silence is insolubly ambiguous ... [and] ... it would be fundamentally unfair to impeach an explanation subsequently offered at trial."). There existed no basis for exclusion of this testimony.

C. Evidence concerning defendant's sanity at the time of the offense.
Finally, defendant claims the trial court should not have admitted testimony from both Dr. Ware on cross-examination and rebuttal testimony from witness Dr. George Seiden (who also examined defendant to determine his capacity to proceed), indicating he knew right from wrong at the time he committed the offense.
The record reveals that on cross-examination, the State asked Dr. Ware if he believed defendant knew his conduct was wrong when he committed the offense even if he was under the influence of alcohol *1098 or drugs and the witness responded affirmatively. Similarly, on rebuttal the State elicited testimony from Dr. Seiden who opined that at the time of the offense, defendant "was not suffering from any mental disease or defect that would have interfered with his ability to know the rightness or wrongness of his behavior." (R., vol.XV, p. 3687).
Once more, we point out the defense introduced Dr. Ware's report during its case-in-chief at the penalty phase. That report stated that while defendant "possibly was under the influence of alcohol and/or drugs, [he] was clearly aware of his behavior and the significance of his behavior at the time that he committed the offense." D. Exh. D-1, p. 4.
While the State may not introduce new issues or facts or reserve part of its case-in-chief for rebuttal, see State v. George, 95-0110 (La.10/16/95), 661 So.2d 975, 981, the fact that rebuttal evidence may incidentally strengthen the State's case does not render it inadmissible. State v. Huizar, 414 So.2d 741, 750 (La.1982); State v. Howard, 45 So. 260 (La.1908). See also LA.CODE EVID. ANN. art. 611(B); LA.CODE EVID. ANN. art. 611(E). Accordingly, neither the testimony elicited on cross-examination nor that introduced on rebuttal was improper. This argument lacks merit.

The trial court erred when it sustained State objections to questions posed to defendant's relatives at the penalty phase.
Defendant claims the trial court erred when it sustained State objections during the penalty phase after defense counsel asked defendant's mother and sister if they wanted the jury to spare his life. The trial court agreed with the State's assessment that the questions were "inappropriate" and appealed to the "passion, sympathy and prejudice" of the jury. Defendant contends these rulings prevented jurors from considering his family members' pleas for his life and thus all mitigating evidence relevant to his case.
The State's objections appear rooted on the jurisprudential restraints placed on its opportunity to present evidence from members of the victim's family about the appropriate penalty for the defendant's actions. Although the Eighth Amendment does not preclude the State from offering some limited "victim impact" testimony from members of the victim's family, Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), it does preclude the State from introducing the opinions of those family members that the defendant should die for his crime. Id., 501 U.S. at 831, 111 S.Ct. 2597, n2 (permissible victim-impact evidence does not include "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence...."); State v. Bernard, 608 So.2d 966, 970 (La.1992) ("Evidence of the victim's survivors' opinions about the crime and the murderer is clearly irrelevant to any issues in a capital sentencing hearing."). At least from the State's perspective, the converse of that rule should also follow: members of the defendant's family should not have an opportunity to express their opinions about the crime and the offender.
Concerns for an even playing field must yield to the defendant's constitutional right to present any relevant mitigation evidence. While the Eighth Amendment allows the State to present only a limited amount of victim impact evidence, carefully circumscribed in scope, "[u]nder the aegis of the Eighth Amendment [the Supreme Court has] given the broadest latitude to the defendant to introduce relevant mitigating circumstances reflecting on his individual personality, and the defendant's attorney *1099 may argue that evidence to the jury." Payne, 501 U.S. at 826-27, 111 S.Ct. 2597. Given the breadth of the defendant's Eighth Amendment right to present any and all relevant mitigating evidence, it would be a difficult rule of law to enforce that the defendant's family members may restate in exacting detail the extenuating circumstances in the defendant's background and yet not express their conclusion based on that evidence that the defendant should live despite the severity of his crime.
Nonetheless, while the trial court may have erred when it sustained the State's objections, we find it had no effect on the jury's verdict and was thus harmless. Jurors certainly inferred that if permitted to respond to counsel's questions, defendant's mother and sister would have expressed their desire that he not receive the death penalty. Cf. Taylor, 669 So.2d at 371 (Assuming that testimony indicating victim's family had no sympathy for defendant should not have been admitted, the error was harmless as such evidence "certainly would come as no surprise to a member of the jury"). As a result, this argument lacks merit.

Aggravating Circumstances
Defendant claims the State failed to present sufficient evidence during the penalty phase to prove the murder occurred during the perpetration of an aggravated kidnapping.
"A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, determines that the sentence of death should be imposed." LA.CODE CRIM. PROC. ANN. art. 905.3. In the context of the sentencing phase of trial and in conformity with art. 905.3, the jury must specify the aggravating circumstances found as the basis for imposing the death penalty. LA.CODE CRIM. PROC. ANN. art. 905.7.[38] As required by art. 905.7, the jury in the penalty phase specified on its jury verdict sheet that two aggravating circumstances were applicable in the present case: (1) the defendant committed the murder during an aggravated kidnapping;[39] and (2) the offense was committed in an especially heinous, atrocious or cruel manner.
Defendant maintains the State did not prove the essential element that he intended to force the victim to give up anything of apparent or prospective value in exchange for her release.[40] Given the absence of the essential element of extortion, defendant claims the evidence only supported a conviction for second-degree kidnapping. See LA.REV.STAT. ANN. § 14:44.1.
In State v. Berry, 99-0001 (La.5/7/99), 735 So.2d 618, 619 (per curiam), the defendant was convicted on three counts of aggravated kidnapping in which the distinctive ransom element of the crime was *1100 shown by the perpetrators' action in gathering a female victim and her two children into the bathroom of a home they shared with the male victim, as a means to extort money from the victim. This Court found, however, that jurors could only speculate whether that was the offenders' intent or whether they were simply moving the woman and children out of the way to facilitate the murder of the victim, which occurred in short order. Berry, 735 So.2d at 619. As the evidence otherwise satisfied all elements of the responsive verdict of second-degree kidnapping committed when the armed perpetrators forcibly secreted the victims inside their own home, LA.REV.STAT. ANN. § 14:44.1(A)(5) and (B)(3), the Court entered judgments of guilty for three counts of that offense and remanded for re-sentencing. Id.; see also State v. English, 367 So.2d 815, 823 (La.1979) ("Arguably, the extinction of a debt by killing the creditor is the gaining of something of value under the statute, but there is no[ ] evidence that the defendant intended to condition the release of the victim upon the payment of ransom, and it is that intent which distinguishes aggravated from simple kidnapping.").[41]
In the present case, the State does not contest that the evidence failed to support a finding of aggravated kidnapping. Rather, the State makes two arguments in support of its position that the jury's sentencing verdict may still stand. First, the State suggests that because second-degree kidnapping is a responsive verdict of aggravated kidnapping as a matter of LA.CODE CRIM. PROC. ANN. art. 814(A)(18), and a statutory aggravating circumstance as a matter of LA.CODE CRIM. PROC. ANN. art. 905.4(A)(1), and because the evidence fully supported a finding beyond a reasonable doubt that the defendant committed a second-degree *1101 kidnapping when he abducted the victim while armed with a dangerous weapon and then killed her, the jury necessarily found a valid aggravating circumstance under art. 905.4(A)(1) when it listed aggravated kidnapping on the verdict form. Secondly, the State also invokes this Court's settled jurisprudential rule that the failure of one or more aggravating circumstances does not require setting aside a capital sentencing verdict which rests in part on other valid aggravating circumstances the jury found.
The State's first argument rests on the premise that second-degree kidnapping is not only a statutorily responsive verdict of aggravated kidnapping as a matter of LA.CODE CRIM. PROC. ANN. art. 814(A)(18), but also a true lesser and included offense. It is settled that a lesser and included offense is one in which all essential elements are also essential elements of the greater charge, such that evidence sufficient to support a conviction of the charged offense necessarily supports conviction on the lesser offense. State v. Porter, 93-1106 (La.7/5/94), 639 So.2d 1137, 1140-42. However, for reasons that follow, we find second-degree kidnapping was not a true lesser and included offense of aggravated kidnapping, at least in the present case, and this Court therefore may not say that in returning the greater offense the jury necessarily found all of the elements of the lesser crime.
In its jury instructions at the guilt phase, the trial court charged jurors that "[a]ggravated kidnapping is the forcible seizing and carrying of any person from one place to another, with the intent to force that person or another person to give anything of apparent present or prospective value, or to grant any advantage or immunity in order to secure the release of a person under the offender's actual or apparent control." (R., vol.XV, p. 3527). At that time the trial court further informed jurors that second-degree kidnapping "is the forcible seizing and carrying, enticing, or persuading of a person to go from one place to another when the person is physically injured or when the person is reasonably led by the offender to believe that the offender is armed with a dangerous weapon or when the offender is armed with a dangerous weapon." Id.; see LA.REV.STAT. ANN. § 14:44.1(A)(3) and (5).
The trial court did not repeat these instructions at the close of the penalty phase. It simply informed jurors that the first of the two aggravating circumstances the State urged required them to find the defendant had engaged in the commission or attempted commission of, inter alia, aggravated kidnapping or second-degree kidnapping. However, under the trial court's instruction at the guilt phase, jurors could find the defendant had committed an aggravated kidnapping and yet not find either that the defendant had been armed with a dangerous weapon or that he had inflicted physical injury on the victim, although the evidence would have fully supported those findings if jurors had actually returned the sentencing verdict form with the offense of second-degree kidnapping listed as an aggravating circumstances. Thus, while this Court may sustain the defendant's conviction at the guilt stage under a general verdict returned by the jury because a rational trier of fact could have found on the evidence presented at trial that the victim had died during the commission of a second-degree kidnapping, it may not sustain the defendant's capital sentence on the supposition that in returning a special verdict based on a finding that the victim had died during an aggravated kidnapping jurors also actually found that she had died during the commission of second-degree kidnapping as the offense was defined by the trial judge.
*1102 Nevertheless, as the State advocates in its second assertion, even though the evidence did not support the aggravating circumstance that the murder occurred during the perpetration of an aggravated kidnapping, this Court has held on many occasions that the failure of one or more statutory aggravating circumstances does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Letulier, 97-1360 (La.7/8/98), 750 So.2d 784, 799; Wessinger, 736 So.2d at 192.
Notwithstanding this well established jurisprudence, defendant claims the recent decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires this Court to revisit this rule. In Ring, the United States Supreme Court overruled its prior decision in Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and held Arizona's capital sentencing scheme, in which the jury found all of the facts necessary to convict the defendant of first-degree murder, but the trial court found the aggravating circumstance necessary to punish the defendant with death, as opposed to life imprisonment, violated the Sixth (and by implication the Eighth) Amendment. Ring, 536 U.S. at 589, 122 S.Ct. at 2432 ("Capital defendants, no less than non-capital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."). Defendant claims Ring alters this Court's long-standing analysis because the Court is substituting its own fact-finding by relying on fewer aggravating circumstances than those found by the jury in affirming the jury's sentence of death.
We find defendant's argument misplaced. By invalidating certain aggravating circumstances found by jurors, the Court is not substituting its own fact-finding for that of the jury, but rather performing its appellate duty by reviewing the evidence to ensure that it meets the standard set out in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560(1979).[42] The holding of Ring thus does not supplant the Supreme Court's decision in Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), that in a "non-weighing" state, such as Louisiana, in which a jury is not required to find that the aggravating circumstances outweigh any mitigating factors by a particular evidentiary standard, "a death sentence supported by at least one valid aggravating circumstance need not be set aside ... simply because another aggravating circumstance is invalid in the sense that it is insufficient by itself to support the death penalty." Id., 462 U.S. at 884, 103 S.Ct. 2733.
In this case, evidence of the invalid aggravating circumstance did not interject an arbitrary factor into the proceedings because evidence of defendant's conduct and of the circumstances leading up to and following the murder was relevant and properly admitted at trial. In addition, as discussed above, while the evidence may not have supported a conviction for aggravated kidnapping it was legally sufficient to prove both second-degree kidnapping and aggravated burglary, both valid aggravating circumstances under LA.CODE CRIM. PROC. ANN. art. 905.4(A)(1). Hence, no arbitrary factors were interjected into the proceedings. See State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, 1242, cert. *1103 denied, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997).
While Ring does not alter this Court's analysis, we must next examine whether the State proved the heinousness aggravating circumstance it also relied upon during the penalty phase. This Court has held the statutory aggravating circumstance of heinousness is given a narrowing construction and that to be valid there must exist elements of torture, pitiless infliction of unnecessary pain or serious bodily abuse prior to death. See State v. Brogdon, 457 So.2d 616, 630 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). This Court has also held that the murder must be one in which the death was particularly painful and one carried out in an inhumane manner. State v. Baldwin, 388 So.2d 664, 677 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981).
The Coroner, Dr. George McCormick, performed the autopsy and testified as an expert in forensic pathology. Dr. McCormick stated the victim suffered multiple injuries, consisting of blunt trauma to the face and chest, as well as sharp trauma wounds to the neck and head. Among the most serious injuries included an incision or cutting of the airway to the victim's throat which resulted from four slashing wounds to her neck. Although the victim's airway was cut multiple times, the blood vessels of the neck, the carotid arteries and jugular veins, were not incised. The victim also suffered periorbital contusions of the right and left eyes, a lacerated right ear, a fractured nose with contusion crossing the bridge of the nose, and a laceration to the forehead. Additionally, all twelve of the victims's ribs on her left side were fractured and lacerated the lower lobe of her left lung.[43]
Commenting on the order of the wounds, Dr. McCormick opined:
The [blunt] trauma that involved the fractures of the ribs, I can't really put into any time sequence; except to say that she was alive when it happened because she bled internally. The trauma on the left side of her face ... happened probably first because the trauma on the right side of her face could have been done with the assailant standing behind her and to her right; in other words, behind her right shoulder. And the cutting of her neck ... was made with the assailant behind her using the dull knife in a cutting motion like so; across and up to her right. So in my opinion, she was struck on her face, left side, front side, and then her throat cut.
(R., vol.XIV, pp. 2380-81).
The Coroner further testified:
The wound of her chest with the fractured ribs and the lacerated lung without prompt and adequate medical attention would have been fatal. The wound of her head with the hemorrhage around her brain without prompt and adequate medical attention would have been fatal. The wound of her neck and her airway, without very prompt and adequate medical attention also would have been fatal. So there are three different ways that she could have died: the hemorrhage in her chest; the hemorrhage into her head; and the cutting of her airway.
(R., vol.XIV, p. 3474).
However, Dr. McCormick concluded the victim died as a result of a lack of oxygen to her heart. The Coroner stated the potentially fatal wounds did not cause her death:
because the final thing that happened to her was because of her loss of oxygen, *1104 she had what, in layman's terms, would be a heart attack. She had damage[ ] to her heart consistent with an early myocardial infarction or heart attack. And this would take some period of time. It can occur inin less than an hour, certainly; but not in less than five minutes. So she did not die immediately. She had time to be without oxygen for a considerable period of time, such that it damaged her heart.
(R., vol.XIV, p. 3475).
Ultimately, Dr. McCormick agreed the victim "suffered a high degree of pain" before she died and that she was alive throughout the attack. The Coroner also indicated the victim probably lived for approximately 15 to 20 minutes, at least, before dying as a result of the attack. Dr. McCormick agreed the victim could have been killed in a more efficient manner and one in which the pain and suffering she went through would have been greatly diminished. Finally, Dr. McCormick stated the cutting of the victim's airway was "a more prolonged procedure and the [victim] stayed awake longer than if you cut a major [blood] vessel and they bleed out." (R., vol.XIV, p. 3470).
For a crime to have been committed in an especially heinous or cruel manner, the evidence must support a finding of torture or pitiless infliction of unnecessary pain. Hoffman, 768 So.2d at 574; State v. Hamilton, 92-1919 (La.9/5/96), 681 So.2d 1217, 1226, cert. denied, 520 U.S. 1216, 117 S.Ct. 1705, 137 L.Ed.2d 830 (1997); State v. Eaton, 524 So.2d 1194, 1210-1211 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); State v. Brogdon, 457 So.2d 616, 631 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). Torture "requires evidence of serious physical abuse of the victim before death." State v. Sonnier, 402 So.2d 650, 659 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412(1983). This Court has also held the murder must be one in which the death was particularly painful and one carried out in an inhuman manner, so that the victim experienced great pain and was aware of impending death. State v. Castleberry, 98-1388 (La.4/13/99), 758 So.2d 749, 774, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999)(finding heinous nature of crime supported given that defendant forced the victim to look at him before beating him about the head with an iron skillet with such force that the skillet broke and then, finding the victim still alive, smothered him to death, all while the victim was bound and gagged).
Furthermore, a finding that the wounds were inflicted to kill, not to maim or inflict pain, may (but does not necessarily) preclude a finding of the aggravating circumstance that the murder was especially heinous, atrocious or cruel. State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001) (evidence that 11-month-old infant was killed by single gunshot wound to the head held insufficient to support heinousness); State v. Tassin, 536 So.2d 402, 411 (La.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989) (three gunshot wounds to victim's neck and back not heinous). While this Court has retreated from its original view that torture could be psychological as well as physical, see Sonnier, 379 So.2d at 1361-62, in favor of only serious physical abuse of the victim before death, Sonnier, 402 So.2d at 660, n1, awareness of impending doom is still relevant to the finding of heinousness.[44] *1105 Cases involving stabbings in which this Court has determined that the offense had been committed in an especially heinous and cruel manner share the common theme that the victim died slowly.
Most recently, in State v. Legrand, 02-1462 (La.12/3/03), 864 So.2d 89, this Court found the aggravating circumstance of heinousness was supported by the evidence in a case in which the victim was stabbed over 25 times with a variety of weapons. In State v. Taylor, 422 So.2d 109, 117-18 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983), the Court opined that the 20 stab wounds inflicted on the victim may have been accompanied by an intent to kill and not simply to torture, but the number of wounds and the slow manner in which one victim died made the killing especially heinous. In State v. Moore, 414 So.2d 340, 348 (La.1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983), the Court found sufficient proof of heinousness when the victim received 13 stab wounds and died "with awareness of her impending death." This Court did not reach a definite conclusion on the heinous nature of the crime in State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984), but indicated the crime had been committed in an especially heinous, atrocious or cruel manner when the victim, who had received two stab wounds with a butcher knife, had been "left bleeding on the floor before he was, out of cruelty or pity, shot in the head." Kirkpatrick, 443 So.2d at 560. That victim had also received two blows to the head with a heavy glass object. Id.
Notably, in the present case, the trial court gave the jury a limiting instruction, explaining that to find the heinousness aggravating circumstance, it should determine "that the victim was subject to torture, serious physical abuse, or pitiless infliction of unnecessary pain and suffering." (R., vol.XV, p. 3726). In the present case, defendant abducted Mary Malone in the dark of night from the safety of her home, made her drive him seventeen miles in her vehicle to a remote spot, and then beat and brutally murdered her. Additionally, the physical evidence shows that although the temperature that night hovered in the mid-twenties and ice was forming in the ditches, Mary Malone's body was found without warm clothing and the blouse she wore was pulled up around her head. Given the frightening manner of Mary Malone's nighttime abduction from her home, the brutal and painful beating she endured before her airway was cut open multiple times, her exposure to the extreme cold as she was led through the woods and as she was beaten and lay in the act of dying somewhere between twenty and sixty minutes, we find the evidence proved the existence of heinousness in the present case. See Legrand, Taylor, and Moore, supra. In such circumstances, the failure of the evidence to support the additional aggravating circumstance found by the jury that the murder occurred during the perpetration *1106 of an aggravated kidnapping does not warrant setting aside the jury's verdict of death. Zant, supra; Letulier, supra. In light of the limiting instruction given it, we find the jury correctly found the victim was subject to torture, serious physical and mental abuse, or pitiless infliction of unnecessary pain and suffering. Accordingly, we find no merit to the defendant's contention that his death sentence should be vacated.

The penalty phase form was constitutionally insufficient.
In this argument, defendant alleges the language employed on the penalty phase verdict form impermissibly shifted the burden of proving the propriety of a life sentence on the defense. Specifically, defendant claims that although the verdict form used in this case conformed to the statutory requirements of LA.CODE CRIM. PROC. ANN. art. 905.7,[45] it offends constitutional principles by limiting the jury's consideration of mitigation to that offered.
We note that in its instructions to the jury at the conclusion of the penalty phase, the trial court not only addressed the aggravating circumstances, but fully detailed the seven mitigating circumstances, as well as referencing "[a]ny other relevant mitigating circumstance." (R., vol.XV, pp. 3727-28). Thus, the jury was fully informed of the items it had to consider in its deliberation.
Notwithstanding defendant's claims to the contrary, nothing suggests the jury was misled by the statutory language used in the verdict form and accordingly defendant fails to show that it introduced an arbitrary factor into its deliberations. This argument lacks merit.

Evidence demonstrating defendant's mental deficiencies requires the Court to remand the case to determine whether he is mentally retarded and hence ineligible to receive the death penalty pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

Defendant claims the possibility that he may be mentally retarded requires a remand to the district court for an evidentiary hearing on the matter.
In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335(2002), the United States Supreme Court held the execution of mentally retarded persons constitutes an excessive punishment, and thus violates the Eighth Amendment. This Court addressed Atkins in State v. Williams, 01-1650 (La.11/1/02), 831 So.2d 835, 861, and directed trial courts in post-Atkins hearings:
1) to order a pre-trial evidentiary hearing on the issue of mental retardation when the court has `reasonable grounds' to believe a defendant is mentally retarded, [La.C.Cr.P.] art. 643; 2) to hold the hearing before a judge, not a jury; 3) to require the defendant to prove by a preponderance of the evidence that he meets the criteria established in Louisiana's statutory definition of mental retardation, LSA-28:381 [defining retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior, and manifested during the developmental period"].
In response to both Atkins and Williams, the Louisiana Legislature enacted 2003 LA. ACTS 698, which created LA.CODE CRIM. PROC. ANN. art. 905.5.1. The code article provides for a procedure in the event a defendant raises a claim of mental retardation. Under the article, such a defendant has the burden of proving mental retardation by a preponderance of the evidence. LA.CODE CRIM. PROC. ANN. art. *1107 905.5.1(C)(1).[46] The article defines mental retardation as:
a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
LA.CODE CRIM. PROC. ANN. art. 905.5.1(H)(1). The article concludes with an advisory list of several medical conditions which "do[ ] not necessarily constitute mental retardation." LA.CODE CRIM. PROC. ANN. art. 905.5.1(H)(2). Included on the list are mental illness, organic brain damage occurring after age 18, and personality disorders. Id.
In the case sub judice, Dr. Ware's report indicated defendant had been diagnosed as "mildly retarded or at least slow learner level." (D.Exh.2, p. 4). Dr. Ware also testified defendant received a score of 50 out of 100 on his Global Assessment of Functioning (GAF) test. Dr. Seiden, the State's rebuttal witness at the penalty phase, testified defendant's IQ was between 70 and 80. Dr. Seiden also stated he did not consider defendant mentally retarded, but rather that he functioned in the "just below average" range. (R., vol.XV, p. 3688). The Uniform Capital Sentence Report (UCSR) places defendant's IQ in the medium range of between 70 and 100.
The record shows defendant performed poorly in school. Dr. Ware testified defendant reported being expelled from school in ninth grade, while Dr. Seiden's report suggests he dropped out of school in tenth grade while taking ninth grade classes after having repeated two years. Finally, the UCSR indicates defendant completed the eleventh grade.[47]
Notably, as discussed supra, defendant's conduct and demeanor during the investigation of this murder do not support his contention he is mentally retarded. To the contrary, on the present record defendant fails to show a reasonable likelihood he qualifies as mentally retarded. Accordingly, we find a remand to the trial court for consideration of this issue is unwarranted.

BOTH PHASES OF TRIAL

The prosecutor's improper examination of witnesses and closing arguments prejudiced defendant at both phases of trial.
Defendant claims the State engaged in various acts of misconduct requiring reversal of his conviction and/or sentence.
In his first claim, defendant alleges the State should not have elicited information from its DNA expert, Michelle Gaines, indicating that the defense had the opportunity, but failed to conduct its own scientific tests on various physical evidence linking him to the crime. Defendant also claims the State should not have referenced defendant's failure to present evidence contradicting the testimony the State's blood spatter expert provided during his rebuttal argument when responding to the defense closing that the State should have presented testimony from the Coroner on the issue. Defendant claims this line of inquiry and argument impermissibly shifted the burden of proving his innocence to the defense.
*1108 Regardless of the merits of this claim, our examination of the record shows defendant failed to object to the State's questions or argument and waived any claim based on them. LA.CODE.CRIM. PROC. ANN. art. 841. Nevertheless, the State's examination of the witness merely pointed out that defendant had access to the physical evidence if he wanted to challenge the State's findings and did not suggest he possessed the burden of proving his innocence. Similarly, the State's comments concerning defendant's failure to cross-examine its expert blood spatter witness appears proper rebuttal to the defense argument which questioned the validity of the witness's testimony.
In defendant's next claim relating to prosecutorial misconduct, he alleges the State engaged in an improper personal attack on defense counsel when he argued on rebuttal:
And let me touch on a few things here, ladies and gentlemen, that Mr. Lawrence brought out in his closing. We're all familiar with the Wizard of Oz. You remember how Dorothy and the strong man and the lion and all of that were going down the yellow brick road, looking at the almighty Oz, this wonderful man or being; had all powers. And you remember when they finally go there what it was; a little old short round guy with a bald head standing behind a curtain. It was all smoke and mirrors. All smoke and mirrors.
(R., vol.XV, p. 3514).
Again, however, defendant lodged no objection to the guilt phase rebuttal argument and waived any claim based on it. LA.CODE CRIM. PROC. ANN. art. 841. While the State should refrain from making personal attacks on defense strategy and counsel, State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660, 663, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999); see also State v. Duplessis, 457 So.2d 604, 609 (La.1984) (State's comment that "a bus full of witnesses would not be enough for defense counsel because he was a `very skillful lawyer'" improper), in this case, it appears the State was neither making complimentary nor disparaging comments about counsel, but rather referring to the merits of arguments set forth on defendant's behalf. This claim lacks merit.
Finally, defendant claims the State improperly attacked his credibility during the penalty phase when the State referenced various statements he made to law enforcement personnel and sanity commission officers and those witnesses's testimony indicating they believed defendant had lied to them. Notwithstanding defendant's assertions in this regard, after thoroughly reviewing the record, we find the State's comments accurately described the evidence presented and hence were not improper. This argument lacks merit.

The trial court erred when it denied defendant's motion for a mistrial based on the allegation that the Sheriff had been exerting an improper influence on the jury.
Defendant claims the trial court should have granted a mistrial based on the Bossier Parish Sheriff's alleged improper contact with the jury.
The record reveals that after the defense rested at the penalty phase and the trial court excused jurors for a 15-minute recess, defense counsel moved for a mistrial, arguing as follows:
At this time the defense would move for a[m]is[t]rial in this case based upon the conduct of Sheriff Larry Deen in positioning himself in such a manner that every time the jury comes or goes from the small confined space of the courtroom, that they have to come to him, face him and make a turn to head *1109 out the door. And each time they come or go, Sheriff Deen nods to the jury, to each individual person, in an attempt to exert, it's our contention, every possible undue influence on the jury that he can. Thethere is ample security in the courtroom and Sheriff Deen has, I think, come very close into tuning this into a circus.
(R., vol.XV, p. 3682).
The trial court denied the motion, stating that while it "recognize[d] that the [s]heriff ha[d] been present ... for a majority of th[e] trial," he was under court order to provide security for the courtroom and the sequestration of the jury. (R., vol.XV, p. 3683). The trial court continued that it was not aware of any jurisprudence that suggested it was impermissible to nod at jurors as they entered or exited the courtroom. The State added that despite the Sheriff's presence throughout the trial, defense counsel had not raised the issue previously, "[a]nd additionally, for the record, I think we all nod to the jury as they come and go. I think that's just common courtesy." Id.
LA.CODE CRIM. PROC. ANN. art. 775 requires a mistrial on motion of the defense when "prejudicial conduct inside or outside the courtroom makes it impossible for the defendant to receive a fair trial." Mistrial is a drastic remedy generally and the determination "of whether prejudice has resulted lies in the sound discretion of the trial judge." State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1288-89, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); State v. Smith, 430 So.2d 31, 44 (La.1983). A court official's unauthorized communication to the jury requires reversal of a defendant's conviction if it prejudiced the accused. State v. Duplissey, 550 So.2d 590, 593 (La.1989). When the communication concerns a matter pending before the court, it is presumed prejudicial. Id.
In this case, defendant fails to show any reasonable likelihood the Sheriff made any unauthorized communication, verbal or otherwise, with any members of the jury concerning the merits of the case. Accordingly, the trial court did not abuse its discretion when it denied the motion for a mistrial based on the Sheriff's proximity to jurors and that he nodded at them when they exited and entered the courtroom. This argument lacks merit.

The incomplete record denied defendant the right to appellate review.
Defendant claims he has been denied his right to appellate review as a result of "at least fifty-four off-record bench conferences and at least one off-record charge conference during many of which the trial [court] addressed matters critical to an adequate review of the proceedings below." Brief for Appellant, p. 85.
This Court previously considered the alleged inadequacies in the record when it entertained defendant's "Motion to Remand this Matter to the District Court for Purposes of Reconstructing What Occurred During Off-the-record Proceedings and to Suspend the Briefing Schedule Pending Completion of the Record." We denied the motion on November 7, 2003, ruling:
The motion to remand this case to the district court for purposes of reconstructing the record with regard to unrecorded bench conferences and/or to waive the contemporaneous objection rule with regard to rulings that may have been made during the unrecorded conferences is hereby denied.
Defendant fails to show the unrecorded conferences "prevented [him] from presenting [ ] relevant evidence," or that *1110 "prejudice resulted from the absence in the record of the substance of the conferences." Brumfield, 737 So.2d at 669-70. As noted elsewhere, the record reveals defense counsel did, in fact, lodge numerous objections to various trial court rulings and each of those objections was preserved for appellate review and is treated on its merits. This argument lacks merit.

Cumulative error
In his final two assigned errors with no accompanying argument, defendant claims entitlement to a new trial and/or penalty phase hearing because of the cumulative effect of prejudicial errors. However, as discussed above, the vast majority of errors defendant apparently references in these assignments were either not objected to and hence not reviewable pursuant to LA.CODE CRIM. PROC. ANN. art. 841 and Wessinger or lack merit. In this situation, we find defendant's assignments concerning the aggregate effect errors in the proceedings do not warrant relief. Cf. State v. Strickland, 93-0001 (La.11/1/96), 683 So.2d 218, 239 (harmless errors, however numerous, do not aggregate to reach the level of reversible error); State v. Taylor, 669 So.2d at 364 (unpub'd appx.); State v. Tart, 672 So.2d at 154; State v. Copeland, 530 So.2d 526, 544-45 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989) (citing State v. Graham, 422 So.2d 123, 137 (La.1982)); State v. Sheppard, 350 So.2d 615, 651 (La.1977)); see also, State v. Smith, 95-1826 (La.App. 1 Cir. 9/27/96), 681 So.2d 980, 994, writ denied, 96-2568 (La.3/27/97), 692 So.2d 390; Cf. Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir.1987) (court rejects cumulative error claim and finds that "twenty times zero equals zero"); Foster v. State, 639 So.2d 1263, 1303 (Miss.1994) (finding no "near errors" and so rejecting cumulative-error analysis).

SENTENCE REVIEW
Under LA.CODE CRIM. PROC. ANN. art. 905.9 and LA. SUP.CT. RULE 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has submitted a Uniform Capital Sentence Report (UCSR) and Capital Sentence Investigation Report (CSI) as LA. SUP.CT. RULE 28 § 3(b) requires.
These documents reveal defendant, Jeremiah D. Manning, was 20 years of age at the time of the offense. He is the third of ten children and was born in Caddo Parish to the legal union of Fred and Merline Manning. His parents are presently divorced and his father is currently on parole for a DWI third offense conviction. One of defendant's brothers is also on parole, having prior convictions for aggravated battery and armed robbery. Defendant quit or was expelled from school some time between the 9th and 11th grades. The UCSR estimates his intelligence in the medium range (between 70 and 100). Defendant has neither married nor fathered any children. At the time of the offense, he was living with his father and several siblings. Dr. Paul Ware diagnosed him as suffering from polysubstance abuse resulting from his use of alcohol and Xanax.
As discussed above, as a juvenile, defendant was adjudicated delinquent of simple kidnapping following the incident in which he abducted Carey Chandler. He satisfactorily *1111 completed one year of probation following the adjudication. As an adult, he pleaded guilty in 1999 to simple burglary and received a five-year suspended sentence. His probation was revoked following the present offense.
According to Dr. Seiden's report, defendant has a "limited employment history." Specifically, he worked at Kroger's as a stockman for three days and then began working at a rental store for six or seven months and finally at a construction company "for only a couple of months." (R., vol.II, p. 306). Both Dr. Ware's report and the UCSR indicate defendant worked for his father's lawn care service until his arrest.

Passion, Prejudice, or other Arbitrary Factors
The record does not provide any indicia of passion, prejudice, or arbitrariness. Defendant, a 20-year-old African-American male, killed a 62-year-old Caucasian victim and received a sentence of death from a jury of 12 which included two African-Americans. The trial court's rulings denying defendant's Batson objections and his motion for a change of venue have been discussed in detail, supra.

Aggravating Circumstances
As discussed above, given the absence of any suggestion of extortion, the evidence did not support the aggravating circumstance found by the jury that the offender was engaged in the perpetration of an aggravated kidnapping. In addition, we found that as a result of the victim's suffering, the State successfully proved the heinous, atrocious or cruel aggravating circumstance. Accordingly, the State's failure to prove the offender was engaged in the perpetration of an aggravated kidnapping at the time of the offense does not require this Court to disturb the jury's sentence of death. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, 201, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995); State v. Deboue, 552 So.2d 355, 368 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990); State v. Byrne, 483 So.2d 564, 575 (La.1986), cert. denied sub nom, Byrne v. Louisiana, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986) (The failure of one statutory aggravating circumstance found by the jury to support a death sentence does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings).

Proportionality Review
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wille, 559 So.2d 1321, 1341 (La.1990); State v. Thompson, 516 So.2d 349, 357 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting death penalty was disproportionate).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the *1112 same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 1.
Since January 1, 1976, there have been at least 16 other successful prosecutions for first-degree murder in the 26th Judicial District Court (which is comprised of Bossier and Webster Parishes) involving the present statutory scheme. Of these 16 cases, seven resulted in the imposition of the death penalty, six were affirmed by this Court, and one resulted in the annulment of the death penalty and the imposition of a life sentence.
In State v. Jenkins, 340 So.2d 157 (La.1976), the defendants, Jenkins, Waters, and Paschal, fatally shot a teller at Peoples Bank & Trust Company of Minden during an armed robbery. All three were convicted of first-degree murder and sentenced to death. Their convictions were affirmed, but the death sentences annulled and the defendants sentenced to life imprisonment. In State v. Scott, 362 So.2d 558 (La.1978), the defendant, Lester Scott, was convicted of first-degree murder after getting in an argument with the victim during a dice game and almost severing his head. The defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. The conviction and sentence were affirmed. In State v. Hudson, 361 So.2d 858 (La.1978), a jury convicted Tracy Lee Hudson of the first-degree murder of Wendell G. Craig. The two men were arguing in the trailer park in which they lived, when defendant stabbed and killed the victim. The defendant was sentenced to life imprisonment. This Court affirmed his conviction and sentence, which was later reversed by the United States Supreme Court on double jeopardy grounds. State v. Burnham, 369 So.2d 1331 (La.1979), involved the beating death of a man who made sexual advances toward the defendant at a bar. Defendant was convicted of first-degree murder and sentenced to life imprisonment. His conviction and sentence were affirmed. State v. Clark, 375 So.2d 383 (La.1979), involved the shooting of a 19-year-old girl as she stood next to the defendant's wife in Ms. Clark's home. Following a night of drinking, defendant broke into his estranged wife's home where he fired the fatal shot. The 42-year-old defendant was convicted of first-degree murder and sentenced to life imprisonment. In State v. Gaskin, 412 So.2d 1007 (La.1982), and State v. Thomley, 420 So.2d 685 (La.1982), the two teenage defendants and a third accomplice grabbed the victim off of the street on Halloween night, threw her into their car, and forced her to perform oral sex on them as they drove through rural Bossier Parish. At the end of the ride, Thomley removed the young girl from the automobile, let out a "rebel yell" and slit her throat. Gaskin then finished her off by repeatedly stabbing her. Gaskin and Thomley were convicted of first-degree murder and sentenced to life imprisonment. Their accomplice turned State's evidence, pled guilty to armed robbery and was sentenced to thirty years. State v. Moore, 414 So.2d 340 (La.1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983) involved the rape and murder of a young mother committed in the victim's home. The defendant stabbed the victim fourteen times following a rape perpetrated in the presence of the victim's four month-old daughter. The murder was also preceded by a ransacking of the victim's home. Moore's conviction of first-degree murder and sentence of death were affirmed. State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984) involved the murder of a service station attendant during the commission of an armed robbery. Knighton was sentenced to death and his conviction and sentence were affirmed. In State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. *1113 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985) Jimmy Wingo and Jimmy Glass forcibly entered the home of Mr. and Mrs. Newt Brown. They bound and gagged the Browns, ransacked the house, and stole a large amount of money, a .38 caliber pistol, a .30-.30 lever action rifle, a shotgun, and some items of clothing. They then killed Mr. and Mrs. Brown by shooting them execution style in the back of the head. The defendants were convicted of first-degree murder and sentenced to death. Their convictions and sentences were affirmed. State v. McGuffey, 486 So.2d 1101 (La.App. 2 Cir.1986), writ denied, 501 So.2d 767 (La.1987), involved the murder and sexual mutilation of 46-year-old Earline Crabtree. McGuffey and his victim had arranged a late night rendevous in a rural area following the close of the defendant's tavern. The victim's body was subsequently discovered in a pond. Her rings and money were missing. She had been stabbed repeatedly and almost all of her facial bones had been broken. Her pubic hair had been "scalped" and a foreign object had been forced into her vagina. Each wound was inflicted before death. McGuffey was convicted of first-degree murder and sentenced to life imprisonment. His conviction and sentence were affirmed. In State v. Byrne, 483 So.2d 564 (La.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986), Edward Byrne, Jr., bludgeoned his girlfriend, Roberta Johnson, to death during the course of an armed robbery. He was subsequently convicted of first-degree murder and sentenced to death. His conviction and sentence were affirmed. In State v. Monds, 91-0589 (La.App. 4 Cir. 1/14/94), 631 So.2d 536, writ denied, 94-0626 (La.4/22/94), 637 So.2d 164, James Monds was convicted of the stabbing death of Vicky Thomas. Thomas suffered a total of 19 wounds with the fatal wound cutting through all major parts of her neck. Defendant was convicted of first-degree murder and sentenced to life imprisonment. The court of appeal reversed his conviction on the basis of insufficient evidence.[48] In State v. Jordan, 31,568 (La.App. 2 Cir. 2/24/99), 728 So.2d 954, writ denied, 99-893 (La.10/8/99), 750 So.2d 177, James Kevin Jordan repeatedly stabbed and strangled Jimmy Hudson, Jr. He was convicted of first-degree murder, but the jury deadlocked during the penalty phase and accordingly, the trial court sentenced him to life imprisonment. His conviction and sentence were affirmed on appeal. In State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, the 35-year-old defendant entered the apartment of the 12-year-old victim who was a friend of his daughter. He tied the victim up with duct tape, beat her, sexually assaulted her, and strangled her to death. A jury convicted the defendant of first-degree murder and sentenced him to death. This Court affirmed the conviction and sentence. In State v. Coleman, 32,906 (La.App. 2 Cir. 4/5/00), 756 So.2d 1218, writ denied, 00-1572 (La.3/23/01), 787 So.2d 1010, the 17-year-old defendant killed an elderly couple as they prepared for an extended vacation. The defendant had previously performed yard work for the couple and knew they would typically withdraw large amounts of cash from the bank before leaving on trips. The victims were beaten to death with an iron rod and a pair of pliers. A jury convicted the defendant of first-degree murder, but could not agree on a sentence. Accordingly, the trial court sentenced him to life imprisonment at hard labor. The conviction and sentence were affirmed on appeal and this Court denied defendant's writ application. *1114 Finally, in State v. Wright, 01-0322 (La.12/4/02), 834 So.2d 974, cert. denied, 540 U.S. 833, 124 S.Ct. 82, 157 L.Ed.2d 62 (2003), the defendant and his girlfriend engaged in a course of brutal child abuse which resulted in the six-year-old victim's death. The jury convicted defendant and sentenced him to death. The defendant's girlfriend (the victim's mother) pled guilty to first-degree murder and received a life sentence. His conviction and sentence were affirmed.
Given the abduction and brutal beating the elderly victim endured before being murdered, a review of the capital verdicts from Bossier and Webster Parishes does not suggest defendant received a disproportionately harsh sentence.
Furthermore a statewide review reveals that juries often return the death penalty in first-degree murder cases which involve the killing of elderly victims during the course of an aggravated burglary. See State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999) (defendant and several others savagely beat and stabbed 82-year-old female victim in her home); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998) (defendant savagely stabbed an elderly couple to death during robbery in their home; victims were 76 and 71); State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116 (La.1996) (defendant bound and repeatedly stabbed elderly couple to death during robbery in their home; victims were 70 and 66); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991) (defendant shot couple, ages 65 and 56, in their home during an armed robbery); State v. Wingo, supra; State v. Glass, 455 So.2d 659 (La.1984) cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (same; co-defendant of Wingo); State v. Celestine, 443 So.2d 1091 (La.1983), cert. denied, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 154 (1984) (defendant strangled an 81-year-old woman in her home during an aggravated rape); State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983) (defendant repeatedly stabbed a 74-year-old woman during an armed robbery in her home). Compared to these cases, it cannot be said the death sentence in this case is disproportionate.

DECREE
For the reasons assigned herein, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under LA.CODE CRIM. PROC. ANN. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by LA.REV.STAT. ANN. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under LA.REV.STAT. ANN. § 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
JOHNSON, J., concurs.
*1115 TRAYLOR, J., concurs and assigns reasons.
VICTORY and WEIMER, JJ., concur for the reasons assigned by TRAYLOR, J.
TRAYLOR, Justice, concurring.
I agree with the majority that the conviction of first degree murder and sentence of death should be affirmed. I write separately to concur with the result reached by the majority with regard to a penalty phase assignment of error. The majority concludes that the trial court erred when it sustained the state's objections to questions posed to the defendant's relatives at the penalty phase but that the error was harmless. It is my opinion that the trial court did not err, even harmlessly, when it sustained the prosecutor's objections.
The record shows that defense counsel asked the defendant's mother and sister if they wanted the jury to spare the defendant's life. There is no question that the inquiry was meant to evoke an appeal to the sympathy of the jurors. The majority concludes that defense counsel's question was proper under the broad latitude of the Eighth Amendment of the U.S. Constitution. The majority also recognizes the difficulty in enforcing a rule of law which would allow the defendant's family members to restate, in exacting detail, the extenuating circumstances in the defendant's background and yet not express their conclusion that the defendant should live despite the severity of the crime.
I believe there is no more difficulty inherent in drawing the line at the defense witness's sentencing preference than there is in drawing the line at the victim's family's sentencing preferences. Under both Payne v. Tennessee[1] and State v. Bernard,[2] it would have been improper for the prosecutor to directly elicit from the victim's family members their sentencing preferences.
There is more at issue here than a concern for a level playing field. Capital jurors are instructed, even at the penalty phase, that they are not to be influenced by sympathy, passion, prejudice, or public opinion. That means that the jurors are not to be influenced by sympathy for the victim or for the defendant, but are to render a just verdict.
As this Court noted in State v. Brogdon, 457 So.2d 616, 629 (La.1984), "the instruction does not specifically direct the jury to eschew sympathy for the defendant but may have been intended to avoid a decision based on sympathy for the victim." In State v. Bourque, 96-0842 p. 13 (La.7/1/97), 699 So.2d 1, 10, we refined that understanding by noting that the instruction calls for the jury "to eschew sympathy altogether." Bourque noted "[w]e are unpersuaded by defendant's attempt to twist this established proper jury instruction into one by which jurors would be instructed to remain uninfluenced by sympathy for the victim only, when the proper instruction cautions jurors from being influenced by sympathy for either the defendant or the victim." Id.
Because jurors should not base their sentencing verdicts on passion, prejudice, sympathy or public opinion, I do not believe the solicitation of testimony that is nothing more than a bid for sympathy for the defendant (or the state) is proper relevant evidence. Naturally, a distinction must be maintained between the direct solicitation of a witness's sentencing preference by an attorney and the spontaneous reaction or unsolicited comment of a family member or other witness for the defendant or the state. In cases where unsolicited *1116 or spontaneous comments are made, I believe the Court should continue to utilize the harmless error standard. See ex. State v. Taylor, 93-2201 p. 13 (La.2/28/96), 669 So.2d 364, 371 ("that the victim's survivors might have little or no sympathy for the defendant certainly would come as no surprise to a member of the jury" or that the defendant's family would seek mercy from the jury).
In this case, however, where defense counsel asked the direct question of what was the witness's sentencing preference, I think the trial judge properly sustained an objection. Therefore, I do not think that the trial judge's action in sustaining the state's objection to the direct question was error.
For these reasons, I respectfully concur with the majority's conclusion with regard to this assignment of error. In all other respects, I agree with the majority opinion.
NOTES
[1] This capital case comes before us as a direct appeal pursuant to the appellate jurisdiction granted pursuant to LA. CONST. ANN. Art. V, § 5(D).
[2] The officer explained:

I knew [the victim] personally. I knew it was completely out of character for her either to be out by herself at that time of night; for her to be in the Ivan [Flats] area. And certainly for her to have loaned her car out. Making the situation much worse was that the Plain Dealing police had checked her house; found food cooking, the door open. This was completely out of character.
(R., vol.XIV, p. 3289).
[3] Details concerning the substance of defendant's statements can be found in the portion of the opinion addressing his argument that the trial court erred when it denied his motion to suppress. That depiction further shows how defendant's statements evolved as he remained in custody.
[4] The trial court earlier expressed serious reservations about the merits of defendant's motion. It stated at the pretrial hearing:

I'm not inclined to take the matter under advisement because this is not the first time that I have dealt with high profile cases and probably won't be the last time that I have dealt with high profile cases. And it's been my position, and I have found that in all of those high profile cases, that  and the very first time that I recall one being brought up was the Highland rapist, Danny Goodson. And this case has received no where [sic] the publicity that the Highland rapist had. And that case was tried. There was a motion to change venue filed in it and that motion was deferred until the jury was impaneled. And each of the jurors were questioned specifically concerning their knowledge of the case. And to be honest with you, I was surprised the number of people who either did not know of it or had made no  drawn no inferences from what they had heard about it. There are a number of people, contrary to popular belief, that don't read the Shreveport Times and don't watch the local media. And at this point, I'm going to defer ruling on this. I'm going to wait `til the jury is impaneled and we question them. If  at that point, if it becomes apparent that there is pre-trial publicity  obviously if the northern end of the parish was the most populous portion of this parish, you might have some argument with regard to your  or you might have some merit with regard to your argument. But Plain Dealing is probably one of the smallest populated areas in the parish. It's  the population of Plain Dealing is probably less than ten (10%) percent of the total parish population. And I don't believe at this point it would be appropriate for the [c]ourt to rule one way or another. I think until such time as we've had an independent  or a chance for an independent examination of the prospective jurors, that the [c]ourt cannot, at this time, make a call on whether or not a change of venue would be proper. So I'm going to refer this to the jury selection process. And if during that jury selection process it becomes apparent that we're not able to select a fair and impartial jury, we'll revisit the issue.
(R., vol.IV, pp. 957-58).
[5] In an appendix to his brief, defendant has attached additional materials he claims "are necessary [for] this Court's full consideration of his case." Brief for Appellant, p. 1, n1. In a separate filing, defendant submitted a motion to supplement the record with these materials. We referred defendant's motion to the merits. While defendant frequently refers to material outside the record in his brief, we consider only those exhibits filed in the trial court. See State v. Hilaire, 216 La. 972, 45 So.2d 360, 363 (1950) (in criminal cases, Supreme Court, as a court of appellate jurisdiction is bound by record).

Recently, in State v. Clark, 02-1463 (La.6/27/03), 851 So.2d 1055, we similarly referred to the merits the defendant's motion to supplement the record with documents relevant to his motion for a change of venue. On appeal, we denied the motion noting that, as here, "defendant had the burden of proof below and was afforded a hearing." Id., 851 So.2d at 1068.
In this case, defendant could have moved to reopen the hearing on the issue to introduce more evidence in support of his motion before the first witness was sworn. LA.CODE CRIM. PROC. ANN. art. 621; LA.CODE CRIM. PROC. ANN. art. 521. Given defendant's failure to meet his obligation to supplement the record before trial, we decline to consider any new documents submitted on appeal.
[6] THE TIMES is a daily newspaper publication in Shreveport, Louisiana.
[7] Plain Dealing has a population of 1,079. U.S. CENSUS BUREAU (2000).
[8] An excerpt from one of the articles reads:

Plain Dealing's first homicide in 16 years has fueled such lingering worries here that the sheriff's office plans to step in and offer free personal safety/self-defense training to concerned residents later this month.
Larry Burton, Murder in Plain Dealing fuels fears, THE TIMES, January 19, 2001, at 1A; Def exh. 1, no. 10.
[9] The mayor of Plain Dealing employed the victim as a clerk in the pharmacy he owned. Ed Baswell, Murder devastates Plain Dealing, BOSSIER PARISH POST, December 27, 2001 at 1.
[10] In fact, 89% of the prospective jurors in Frank indicated they had been exposed to information about the case on more than one occasion or from multiple sources. Frank, 803 So.2d at 17.
[11] The trial court was apparently referring to a case in which another defendant was tried for a series of rapes occurring in both Caddo and neighboring Bossier parishes. See State v. Goodson, 437 So.2d 1174, 1178-79 (La.App. 2 Cir.1983). See also n3, supra, where the trial court specifically references this earlier crime.
[12] Bossier Parish has a population of 100,786. U.S. CENSUS BUREAU (2000).
[13] Given the close-knit nature of the community, defendant also claims the trial court erred when it failed to entertain his motion for individualized voir dire. Specifically, he alleges the publicity surrounding the case warranted individual interviews and asserts that questioning in unsequestered panels caused him to forego extensive inquiry concerning the details of the jurors' pretrial exposure to publicity or risk the potential tainting of the entire jury venire as a result of unintended and unprecipitated statements by jurors pursuant to such interrogation. Consequently, defendant complains he could not meaningfully explore the prejudice tainting the venire and produce an accurate record concerning the degree of pretrial publicity to the case.

From the outset, we find defendant abandoned his motion for individualized voir dire when he failed to pursue the issue in the trial court. Nevertheless, there is no provision in Louisiana law which prohibits or requires the sequestration of prospective jurors for individual voir dire. State v. Copeland, 530 So.2d 526, 535 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989); State v. Comeaux, 514 So.2d 84, 88 (La.1987). The trial court has the discretion to decide whether the jurors should be called singly or in groups. LA.CODE CRIM. PROC. ANN. art. 784, Comment (c); Comeaux, 514 So.2d at 88. Without a showing of "special circumstances," the trial court does not err in refusing requests for individual voir dire. State v. Goodson, 412 So.2d 1077, 1081 (La.1982). The fact that a case is a capital case does not alone establish the existence of special circumstances. Copeland, 530 So.2d at 535; Comeaux, 514 So.2d at 88; State v. Wingo, 457 So.2d 1159, 1165 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985). Notably, while a number of prospective jurors indicated they had some knowledge of the crime, very few stated they had formed an opinion about defendant's guilt or innocence. Furthermore, the trial court did not limit the examination of the prospective jurors concerning their knowledge of the present crime.
[14] As a practical matter, we note defendant had been in custody for approximately 30 hours before he made the videotaped statement, thus diminishing the effect of any intoxicating agents he may have consumed.
[15] While an arrest requires probable cause, an investigatory stop requires only the lesser standard of reasonable suspicion enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889(1968); LA.CODE CRIM. PROC. ANN. art. 215.1. An investigatory stop, like an arrest, is a complete restriction of movement, but for a shorter period of time. See United States v. Merritt, 736 F.2d 223, 229 (5th Cir.1984); State v. Bailey, 410 So.2d 1123, 1125 (La.1982). In making a brief investigatory stop the police still "`must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" State v. Kalie, 96-2650 (La.9/19/97), 699 So.2d 879, 881 (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).
[16] Notably, we observe the trial court muted the portion of the interview in which Myrick stated to defendant, "You don't want any more trouble. You've had some problems before. You don't want no trouble. You don't want to go to jail." (R., vol.I, p. 222).
[17] LA.CODE CRIM. PROC. ANN. art. 841(A) provides:

A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
[18] LA. CONST. ANN. art. I, § 17(A) provides, in pertinent part, "The accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of peremptory challenges shall be fixed by law."
[19] After the trial court denied defendant's challenge for cause, the defendant exercised a peremptory challenge with regard to Michael Hinderberger and he did not serve on the jury.
[20] Compare State v. Sylvester, 400 So.2d 640 (La.1981), where it was shown the trial court abused its discretion in failing to grant defendant's cause challenge to a retired police officer. In that case, the prospective juror, though retired, had been employed for years with the law enforcement agency that investigated the homicide, his son currently served with the law enforcement agency, and he himself actively supervised and trained four of the investigating officers who would testify against the defendant. The present case pales in comparison to Sylvester.
[21] Ultimately, Debra Pijanowski was seated as a juror.
[22] The "substantial impairment" standard applies to the reverse-Witherspoon challenges. In Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of the aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. Morgan, 504 U.S. at 729, 112 S.Ct. 2222. The Morgan Court adopted the Witt standard for determining if a pro-death juror should be excused for cause. In other words, if the juror's views on the death penalty are such that they would "prevent or substantially impair the performance of their duties in accordance with their instructions of their oaths," whether those views are for or against the death penalty, he or she would be excused for cause. Id.
[23] Moss originally stated that before he voted for the death penalty, he "probably would" require a standard of proof greater than beyond a reasonable doubt. (R., vol.V, p. 1221).

Stevenson stated that her brother had been murdered 25 years earlier and that the perpetrator had never been caught and described her relatives encounters with law enforcement. (R., vol.XI, pp. 49-52).
Finally, Taylor stated that she had been robbed at gunpoint 25 years ago and that her cousins "probably just beat up ... [or] took care of" the perpetrators. (R., vol.XII, p. 2767, 2794). She also indicated that her brother had been convicted of murder. (R., vol.XII, p. 2772).
[24] The State sought the first-degree murder conviction based on the following aggravating factors: aggravated kidnapping; second-degree kidnapping, armed robbery, first-degree robbery, simple robbery and aggravated burglary. In conformity with LA.CODE CRIM. PROC. ANN. art. 814(A)(1), the listing of possible verdicts in a first-degree prosecution, the verdict was general and did not specify the underlying felony relied upon by the jury.
[25] Defendant never questioned the expertise of Michelle Gaines in the field of DNA analysis.
[26] See supra at p. 5 where it was discussed that Major Myrick testified that a search for Shawn Minnifield and Andrew Lee "J.R." Brantley was conducted. These individuals were located and fully cooperated with the investigating officers. Their DNA samples were acquired and their alibis were successfully checked.
[27] Richard Stanford is the Town Marshall in Plain Dealing, Louisiana. He was included in the DNA sampling because he may have disposed of one of the cigarette butts found in the victim's driveway.
[28] Arbitrary factors are those which are entirely irrelevant or so marginally relevant to the jury's function in the determination of sentence that the jury should not be exposed to these factors; otherwise, the death penalty may be imposed "wantonly or freakishly" or for discriminatory reasons. State v. Comeaux, 93-2729 (La.7/1/97); 699 So.2d 16, 21-22, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998), citing Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
[29] Although the record is clear the weapon was not a knife, the victim admitted she never saw the item used. The transcript describes it variously as a long metal fingernail file (R., vol.XV, p. 3648), toenail clippers (R., vol.XV, p. 3649) (R. vol.II, pp. 412-13), or a nail file (R. vol.IX, p. 3649). For consistency, we will refer to the item as a fingernail file.
[30] The State originally charged defendant in the Chandler incident with aggravated burglary and false imprisonment while the offender is armed with a dangerous weapon. LA.REV.STAT. ANN. § 14:60; LA.REV.STAT. ANN. § 14:46.1. (R., vol.II, p. 398). As noted above, the juvenile court adjudicated defendant as delinquent of committing simple kidnapping.
[31] In fact, when discussing the admissibility of evidence of unadjudicated juvenile crimes, the Jackson court stated:

Evidence of unadjudicated conduct as a juvenile, although sometimes arguably probative as to the character and propensities of the defendant, presents a greater risk of injecting arbitrary factors into a capital sentencing hearing. We therefore place a more stringent limitation on the prosecutor's use in the case-in-chief of a capital sentencing hearing of evidence of unadjudicated conduct as a juvenile. Id. at 956 (emphasis added).
Accordingly, the evidentiary rules governing the admissibility of delinquency adjudications at the penalty phase should be at least as stringent as those for adult convictions.
[32] LA.REV.STAT. ANN. § 14:2(3) defines a dangerous weapon as "any ... instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." An instrumentality may qualify as a dangerous weapon not solely because of the inherent danger it poses but also because the instrumentality is used in a manner likely to result in death or grave bodily harm. State v. Bonier, 367 So.2d 824, 826 (La.1979). Accordingly, it appears clear the nail file would qualify as a dangerous weapon in this case.
[33] Defendant also complains because the fingernail file used during the commission of the offense and Chandler's tape-recorded statements regarding the incident immediately after it occurred were lost during a fire. Brief for Appellant, p. 49; (R., vol.II, p. 415). However, given that contemporaneous police reports indicated defendant admitted to threatening the victim with the fingernail file in her vehicle, it is unlikely that any exculpatory material was destroyed. In any event, the accidental destruction of the evidence does not warrant this Court's intervention. See Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281, (1988) (state's negligent failure pre-trial to preserve potentially exculpatory "useful" evidence, in the absence of demonstrable bad faith, not a violation of due process); California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413, (1984) (good faith execution of normal practices leading to the pre-trial destruction of evidence, when not reflective of official animus, does not violate due process); State v. Lindsey, 543 So.2d 886, 891 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990) (approving Youngblood and Trombetta).
[34] Defendant points to the following portion of the direct examination:

Q: What direction were you going?
A: I was going east.
Q: Was that heading towards Highway 160?
A: Yes.
(R., vol.XV, p. 3645).
[35] The relevant portion of the cross-examination provides:

Q: ... [Y]ou drove approximately two (2) block [sic], is that correct?
A: Yes, sir.
Q: Now, you don't know  you weren't headed toward Highway 160, were you?
A: You can turn to Highway 160 from the road that I was on.
Q: You hadn't been turned to go toward Highway ... 160, had you?
A: No. I was just going east.
Q: So you go this two (2) blocks and you stop the car. And did you tell the police that [sic] what you did, you stopped the car and told him, to, quote, get out of your damn car?
A: I probably screamed a little bit more than that.
(R., vol.XV, p. 3648).
[36] Wessinger revived the contemporaneous objection rule for the penalty phase of trial in a holding that the court explicitly made prospective only from the date of decision. This case was tried well after the decision in Wessinger, and counsel's failure to object contemporaneously waived review of the claimed errors on appeal unless the errors were so grave as to interject an arbitrary factor into the proceedings subject to this Court's Rule 28 review. Wessinger, 736 So.2d at 181.
[37] Xanax (Alprazolam) is a prescription tranquilizer. www.healthsquare.com. There is no evidence any physician or psychiatrist prescribed Xanax for defendant's medical treatment.
[38] LA.CODE CRIM. PROC. ANN. art. 905.7 provides, in pertinent part:

The form of jury determination shall be as follows:
"Having found the below listed statutory aggravating circumstance or circumstances and, after consideration of the mitigating circumstances offered, the jury unanimously determines that the defendant should be sentenced to death.
Aggravating circumstances or circumstances found: __________.
[39] Aggravated kidnapping is "the forcible seizing and carrying of any person from one place to another with the intent thereby to force the victim ... to give up anything of apparent present or prospective value ... in order to secure a release of the person under the offender's actual or apparent control." See LA.REV.STAT. ANN. § 14:44.
[40] It appears the purpose of the victim's abduction following the home invasion was apparently to murder her so that there would not be a witness to the offense.
[41] In the present case, the State did not outline for the jury to any great extent during the guilt phase the reason why the evidence would support a verdict based on the defendant's commission of an aggravated kidnapping. In its closing argument during the guilt phase, the State summarized its theory of the prosecution as follows:

So let's put it all together, ladies and gentlemen.... What is first degree murder? The specific intent to kill or to inflict great bodily harm.... While the perpetrator is engaged in the perpetration or an attempted perpetration of any one (1) of the following: the aggravated burglary; was that proven? Yes. The aggravated kidnapping; was that proven? She didn't leave that home at 9:22 or later and drive out voluntarily [with] this fellow on Highway 160. Something of value. Was that all proven? Yes. The armed robbery. Was that proven? Yes. First degree robbery or the simple robbery. So ladies and gentleman, I submit to you that the state has done exactly what we told you we would do. (R., Vol.XV, p. 3503).
In State v. Arnold, 548 So.2d 920 (La.1989), this Court held that a defendant commits the offense of aggravated kidnapping when he abducts the victim with the intent to extort something of value, including sex, by playing upon the victim's hope of release. Arnold thereby made clear that the defendant need not expressly condition the release of the victim upon the victim's surrender of the sought-after "ransom." Id., 548 So.2d at 923. The Court decided Arnold less than a month after the Legislature added the offense of second-degree kidnapping to the Criminal Code, defining the crime in pertinent part as the kidnapping of the victim "to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony...." LA.REV.STAT. ANN. § 14:44.1(A)(2).
It clearly appears from the evidence at trial the defendant forced the victim into her own vehicle and then made her drive to the location on Highway 160 where he eventually killed her. However, the evidence would not permit a rational factfinder to conclude the defendant abducted the victim to facilitate the taking of her car, which he could easily have accomplished in the aggravated burglary that occurred before the kidnapping. In the absence of any evidence that the defendant intended to assault the victim sexually, the reasons why defendant removed her from the home to the isolated location of her death other than simply to kill her remain a matter of conjecture.
[42] Jackson holds that in reviewing the sufficiency of the evidence to support a conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.
[43] Dr. McCormick also noted the victim exhibited defensive wounds, i.e., bruises to the top of the victim's hands in an attempt to ward off the blows.
[44] For example, this Court has found the existence of heinousness in cases in which the victims experienced great pain and were aware of their impending doom. State v. Rault, 445 So.2d 1203, 1219 (La.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984) (victim was raped, strangled, stabbed in the neck and shot twice; Court specifically notes victim's intense mental, as well as physical, pain during the ordeal); State v. Flowers, 441 So.2d 707, 718 (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984) (a 70-year-old widow was severely beaten, raped and strangled in her home); State v. Willie, 436 So.2d 553, 556-57 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984) (victim was taken blindfolded and naked to a remote area where she was tied spread eagle, raped, and had her throat repeatedly slashed).
[45] See n38, supra, for the complete text of LA.CODE CRIM. PROC. ANN. art. 905.7.
[46] In a significant departure from the procedures the Court established in Williams, the new legislation calls for a jury to make the determination of whether a defendant is exempt from capital punishment by reason of mental retardation.
[47] In an appendix to his brief defendant has attached school records that were not submitted to the trial court. Appx., pp. 129-36. Because these reports were not submitted to the trial court, we will not consider them in our assessment of defendant's claim that the records support an Atkins remand. See n4, supra.
[48] Although this crime and the subsequent trial occurred in Bossier Parish, defendant's appeal was transferred by order of this Court to the Court of Appeal, Fourth Circuit, when the judges of the Court of Appeal, Second Circuit, recused themselves.
[1] 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).
[2] 608 So.2d 966 (La.1992).